BERNARD J. POINTER *vs.* VICTOR B. CASTELLANI & others;[1]
BERNARD J. POINTER & others,[2] defendants-in-counterclaim.

Suffolk. September 10, 2009. - December 31, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Corporation,* Close corporation. *Contract,* Employment, Performance and
    breach, Implied covenant of good faith and fair dealing, Interference with
    contractual relations. *Employment,* Termination. *Damages,* Employment
    contract, Breach of contract, Termination of employment contract, Breach
    of fiduciary duty. *Words,* "Freeze-out."

In a civil action, sufficient evidence existed to support the judge's conclusion
    that the plaintiff, a member of a close corporation who served as the
    corporation's president, was subject to a freeze-out when the other members
    of the corporation, in violation of their fiduciary duty, secretly hired a third
    person to replace the plaintiff, barred the plaintiff from the corporation, and
    ultimately fired him as president; likewise, sufficient evidence supported the
    judge's conclusion that the plaintiff's actions (i.e., allegedly engaging in acts
    of malfeasance that materially injured the corporation) did not require his
    termination, because less harmful alternatives existed; further, the judge did
    not err in concluding that the plaintiff had not committed a breach of his
    employment contract [549-554]; moreover, sufficient evidence supported the
    judge's conclusion that the other members of the corporation interfered with
    the plaintiff's employment contract, in that their claim that they terminated
    the plaintiff for cause was contrived [557-558].

In a civil action, sufficient evidence existed to support the judge's conclusion
    that the plaintiff, a member of a close corporation who served as the corpor-
    ation's president, did not usurp a corporate opportunity or engage in self-
    dealing concerning the sale of a parcel of real estate that the corporation
    owned to a business in which the plaintiff owned a fifty per cent interest,
    where the corporation's operating agreement, which established a limited
    business purpose for the corporation, permitted its members to conduct busi-
    ness activities outside the corporation; where no other member of the corpora-
    tion had any interest in the project to develop the real estate; and where the
    transaction was fundamentally fair, in that another member of the corpora-
    tion negotiated with a representative of the purchasing business, the plaintiff
    did not participate in the vote on the sale, and the price was commercially
    reasonable. [554-557]

[1]Paul Woodberry, individually and as manager of Ivy Pointe, LLC; Wood-
berry Family Limited Partnership, through its general partner, Ivy Pointe,
LLC; Kathleen Herbert; Jonathan H. Maurer; Fletcher Granite Company,
LLC, as defendant, nominal defendant, and plaintiff-in-counterclaim.

[2]Stone Ridge Investments, LLC (SRI), and Stone Ridge Management, LLC
(SRM).

In a civil action arising from a close corporation's termination of the employ-
ment of the plaintiff, who was a member of the corporation and served as
its president, the terms of the corporation's operating agreement did not
require the corporation to indemnify or hold harmless the defendant members
of the corporation for any liability arising from their actions in terminating
the plaintiff's employment, where there was no finding that the plaintiff
committed actions in bad faith or as a result of active and deliberate
dishonesty. [558]

In a civil action, a Superior Court judge's remedy for the freezing out of the
plaintiff from a close corporation (i.e., a forced sale of the corporation)
was improper; because further factual findings were necessary to determine
whether the judge's alternative remedy (i.e., reinstatement of the plaintiff
to his position as president of the corporation, together with back pay,
indemnification for reasonable attorney's fees and costs, and appropriate
injunctive relief) could be implemented, this court remanded the matter for
further proceedings. [558-560]

CIVIL ACTION commenced in the Superior Court Department on
April 15, 2004.

After transfer to the business litigation session, the case was
heard by *Allan van Gestel*, J., and posttrial motions were heard
by *Ralph D. Gants*, J.

The Supreme Judicial Court granted applications for direct
appellate review.

*Thomas S. Fitzpatrick* (*Gary S. Matsko* with him) for the
defendants.

*David L. Kelston* (*Theodore Tedeschi* with him) for the plaintiff.

*Thomas B. Rosedale*, for Lori Bornstein & others, amici
curiae, submitted a brief.

IRELAND, J. The plaintiff, Bernard J. Pointer, was part owner
of Fletcher Granite Company, LLC, a closely held corporate
entity. The case commenced in the Superior Court in Middlesex
County and was transferred to the business litigation session,
where a Superior Court judge presided over a jury-waived trial,
lasting some twenty-three days, in which over 750 exhibits were
admitted. In a forty-seven page written decision containing find-
ings of fact and rulings of law, the judge found for Pointer on his
claims against the defendants for a freeze-out and breach of
fiduciary duty; for breach of an employment contract and of the
covenant of good faith and fair dealing; and for interference with
an advantageous relationship. He also found for the plaintiff on
the defendants' counterclaims. We granted the parties' applica-
tions for direct appellate review. Because we conclude that there

was no error in the judge's conclusions and we see no reason to revisit our holding in *Brodie* v. *Jordan*, 447 Mass. 866 (2006), we affirm the judgment. However, we remand the case for a determination of damages or other equitable remedy for the plaintiff on his claim of a freeze-out and further proceedings consistent with this opinion.

*Background and facts.* Proper understanding of this case requires a somewhat lengthy discussion of the essential facts that we gleaned from the findings of the judge. We also present only so much of the lengthy procedural history in this case as is necessary to understand the issues raised. In our review, we do not set aside a judge's findings of fact unless they are clearly erroneous. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 509 (1997). The burden is on the appellant to show that a finding is clearly erroneous. *Id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 510, quoting *Gallagher* v. *Taylor*, 26 Mass. App. Ct. 876, 881 (1989).

1. Fletcher Granite Company, LLC (FGC),[3] was formed on February 25, 1999, by Pointer and defendants Victor Castellani, Paul Woodberry, and Kathleen Herbert to take ownership of the assets of a granite company we shall call Pioneer.[4] Pioneer's granite business included the operation of several quarries, the sale of rough granite to others, the fabrication of granite into various building and landscape items including curbing, and certain real estate that included quarries and abutting properties. One of the pieces of real estate significant for our purposes was an approximately sixty-four acre parcel in Milford that contained wetlands and an abandoned quarry.

Pointer had been president of Pioneer, and his initial involvement in the sale of the business was in that capacity. Ultimately, however, he joined with Castellani, Woodberry, and Herbert. The group had agreed that, when FGC assumed ownership of Pioneer, they would continue to operate the quarry business and sell the real estate.

---

[3]Fletcher Granite Company, LLC (FGC), was formed under the name FG Acquisitions, LLC.

[4]The company was called Fletcher Granite Co., Inc., a subsidiary of Pioneer Concrete of America, Inc., which was a subsidiary of Pioneer International Plc, an Australian entity.

FGC's operating agreement provided that Castellani and Woodberry together would own a fifty-one per cent interest in the business and Pointer would own a forty-three per cent interest. Pointer, Castellani, Woodberry, and Herbert became members of FGC. Pointer, Castellani, and Herbert were the initial managers. The initial managers could not be removed except for a "willful or intentional violation or reckless disregard of the Manager's duties . . [or] a material breach of the Operating Agreement without cure after twenty days notice [by] the Board of Managers." Pointer became FGC's president; he was the only one experienced in operating a granite business. Herbert acted as the chief financial officer, and Woodberry and Castellani, "for the most part, were merely passive investors."[5]

Through a wholly-owned subsidiary, Pioneer also owned a residential subdivision called Greystone Estates, Inc. (Greystone). Pioneer was unwilling to sell its granite business unless it also sold Greystone. Pointer and another individual, Lou Frank, had decided to purchase Greystone. To that end, just before FGC was formed, he and Frank formed Stone Ridge Investments, LLC (SRI), of which Pointer owned fifty per cent. The other members of FGC were interested only in the quarry business and not in Greystone. The other members knew Pointer was involved in SRI, as he conducted SRI business while he was president of FGC. Pointer told the others that he would assist Frank in the Greystone transaction, but Pointer did not disclose that he was a substantial (fifty per cent) owner. Implicit in the judge's findings however, which also has support in the record, is that the others knew he was a principal of SRI. The others learned of the extent of Pointer's ownership only after Pointer's employment was terminated. It is important to note that, as discussed *infra*, Pointer and Frank formed another entity, Stone Ridge Management, LLC (SRM), in 2000.

FGC closed on Pioneer's quarry, mill, and certain real estate on March 30, 1999. All but Woodberry were present at the closing. On April 1, 1999, SRI closed on Greystone. Pointer was the only member of FGC present.

The judge found that, at the time the parties entered into the

[5]Before they joined with Herbert and Pointer, Castellani was a broker who was hired to locate a buyer for Pioneer, and Woodberry was his business associate.

transaction to acquire Pioneer's businesses, Pointer's intention was to stay with FGC as president and ultimately to control FGC.[6] Pointer had a further expectation that he would be involved in the real estate development part of the transaction. The judge found that Castellani and Woodberry had expectations "primarily as investors in the FGC quarrying and granite sales business. They had little interest or expectation in actually running FGC." Herbert's expectations were that she continue her position as financial officer of FGC and own a "small piece of the company." The judge further found that neither Herbert, Castellani, nor Woodberry had any "interest in real estate purchase, sale or development."

2. We now provide some preliminary information about FGC's operating agreement and Pointer's employment contract. Under § 2.3 of the operating agreement, FGC was organized to "own and operate a quarry business and to engage in any other lawful act or activity permitted under the [l]aw." In addition, under § 5.1.4.7 of the operating agreement, the approval of 66.7 per cent of the managers was required for FGC to engage in any business other than that related to quarrying.[7] Furthermore, § 5.4.3 of the operating agreement states:

> "[N]othing in this Agreement shall be deemed to restrict in any way the rights of any Member, or any affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to [FGC] or to any other Member with respect to that business or activity. The organization of [FGC] shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates."

---

[6]FGC's operating agreement provided Pointer with a right of first refusal under certain conditions on the purchase of FGC shares, including Castellani's.

[7]Section 5.1.4.7 of the operating agreement states, in relevant part, that 66.7 per cent of the members had to approve for FGC to engage in any business other than the "quarrying, manufacture and sale of dimension stone, granite curbing, dimensional building stone, granite cobblestone, granite architectural and landscaping stone, cut stone and granite tile and related businesses."

The operating agreement explicitly anticipated that "the conduct of [FGC]'s business may involve business dealings and undertakings with Members and their Affiliates" and required that, "in those cases, . . . dealings and undertakings shall be at arm's length and on commercially reasonable terms."

Pointer's appointment as FGC's president was executed by an employment agreement on April 19, 1999. The agreement was for a specific, renewable term and stated, in relevant part, that Pointer could be removed without a requisite 360 days' notice only if, among other things, he engaged in dishonest or disloyal behavior, committed a material breach of the operating agreement, or substantially failed to perform a material duty. Although the employment agreement stated that Pointer had "to work exclusively for [FGC] and . . . not engage in any other business activity without the prior written consent of [FGC]," it also stated that Pointer could "perform services for SRI to such an extent as [Pointer] may reasonably determine." The judge also found that "everyone knew of Pointer's activities at the FGC offices for SRI/SRM, that all [SRI/SRM documents] plainly listed the same street address as that of FGC, that all of SRI/SRM documents were kept in unlocked files at the office, and that Pointer reimbursed FGC for the time his secretary expended on SRI/SRM matters [for which FGC sent Pointer invoices]."

3. The sale, in 2001, to SRM of FGC's approximately sixty-four acre parcel containing undeveloped land and an abandoned quarry in Milford is at the center of several issues raised in this case and thus requires elaboration.

The judge found that, before Pioneer sold its granite business to FGC, it had granted to Frank an option to purchase its sixty-four acre parcel in Milford (option). The parcel was burdened with the option at the time FGC acquired it as part of Pioneer's granite business. The option had a $475,000 purchase price that was due to expire on March 31, 1999, but on several occasions, Pointer extended it, including an extension until October 31, 1999. Important for our purposes is that the option had a contingency attached that allowed the exercise of the option only if Frank were able to acquire an adjoining property, owned by H.E. Fletcher Trust (Trust land).

The key to understanding the dispute over the sale of FGC's

parcel in Milford (FGC's parcel) is that Frank had developed a plan to purchase several properties owned by different entities and assemble them into one 450-acre tract of land (tract) and to find a builder or developer to buy the tract. Frank's plan contemplated purchasing the various parcels at a significant discount. FGC's parcel was located centrally within the proposed tract, "bisected it, and provided some access to the [tract]."

At some point, Frank offered Pointer the opportunity to join in the project. He presented Pointer with a memorandum describing the plan. The memorandum stated that, if it acquired all the parcels, SRI would control "major acreage in a community very supportive of development" and that several developers also had been in "constant touch" with an eye to being considered.

When Pointer accepted the offer to join with Frank, he knew that (1) a substantial real estate developer, Pulte Homes, had contacted Pointer about FGC's parcel on June 1, 1999 (while it was under the option with Frank), but he had not told FGC members and managers anything about this contact; (2) other developers had expressed interest in the tract property; (3) Frank was already engaged in conversations to acquire two of the parcels, the sale of one of which was likely because of Frank's personal relationships with the owners, and the acquisition of the other of which would constitute a significant component of the tract; (4) Frank had considerable wealth to facilitate the transaction; and (5) Frank believed that the town of Milford would be receptive to development of the tract.

Pointer did not offer FGC any participation in the plan, nor did he inform Castellani, Woodberry, or Herbert of it. However, in September, 1999, at a board meeting, Pointer had reported to FGC members and managers that FGC's parcel did not have value apart from the abutting Trust land and recommended that an appraisal of two pieces be conducted. The minutes from that meeting stated that there was an appraisal of FGC's parcel from two years previously for $170,000.

In January, 2000, without prior consultation with FGC members and managers and with no consideration to FGC, Pointer reinstated the expired purchase option on FGC's parcel and extended it until December 31, 2000. However, the record shows that FGC members knew of this extension of the option and that the option was owned by SRI because Pointer informed them in a memo-

randum dated October 6, 2000. Moreover, in January, 2000, minutes from a board meeting show that Pointer told the others that it might help the sale of FGC's parcel if a purchase and sale agreement was put together between the Trust land and SRI.

SRI began acquiring the properties in February, 2000, and by October, 2000, had acquired three parcels. On October 11, 2000, Pointer and Frank created a separate entity, SRM, to acquire the parcels. Frank and Pointer each controlled fifty per cent of SRM's equity; SRM was owned equally by their children, with Pointer and Frank as managers. By October, 2000, SRM had reached an agreement in principle to sell approximately eighty-five acres for development as an office park at a price of $6 million. The purchaser agreed to assist SRI in pursuing its plans for the entire assembled acreage. Pointer disclosed none of this information to FGC members and managers.

The remaining acreage, which included FGC's parcel and the Trust land, would be a residential development. In the October 6 memorandum, Pointer advocated to FGC that it sell its parcel to "Stone Ridge, LLC"[8] for $250,000. He also stated that he was "partner per se" of "Stone Ridge" and thus would not participate in the vote on the sale but would relay the FGC members' decision to Frank. Pointer did not reveal to the members and managers that he knew that Frank would pay $300,000 for the parcel or that he was on a mission to obtain a discounted price for FGC's parcel.

The record shows that Pointer's October memorandum also stated that Pointer had agreed that "Stone Ridge, LLC would acquire the option if it would cause some action on this piece and facilitate [FGC's] desire to sell [as w]e previously identified this parcel as excess assets . . . ." The memorandum further stated that the option was for $475,000; that there had been two appraisals of FGC's parcel, one for $192,000 and the other for $385,000[9]; and that the $250,000 offer was a *"no contingency cash offer."*

---

[8]As of the date of the memorandum, October 6, 2000, SRM had not been formed. As the judge found and the record supports, although SRI and SRM were two legally separate entities, they were "the same entity," in that both were controlled by Pointer and Frank. They financed and capitalized SRM solely by debt.

[9]The first appraisal was performed for Castellani and mentioned the option

The minutes from the board meeting of October 24, 2000, indicate that the members knew that the town of Milford was interested in putting a golf course in the area; that the land had value only in combination with the Trust land; that "Frank" wanted to purchase the FGC parcel and "use it in conjunction with" Trust land; and that the board could hold out for more money for the parcel if it waited for two to three years for the permitting process. However, the members concluded that obtaining $300,000 was preferable to waiting "on the chance of a larger payout." The members and managers determined that they would offer FGC's parcel for sale for $300,000. A purchase and sale agreement with SRM was executed in November, 2000, for that amount. Pointer and Herbert signed on behalf of FGC and Pointer and Frank signed on behalf of SRM. FGC's parcel was conveyed to SRM in March, 2001.

Concerning the sale price of FGC's parcel, the judge found that Pointer had obtained a copy of another appraisal, which stated that if FGC's parcel were consolidated with others, it would have a value of $525,000. He also found that Pointer did not share the appraisal with FGC.[10] However, the judge found that "a respected real estate appraiser opined [at trial] that $300,000 was a commercially reasonable and fair market price . . . [as t]he parcel was, after all, only [sixty-four] acres in size, containing extensive unusable wetlands and a dangerous abandoned quarry, that [Pioneer] anxiously wanted to sell even before the acquisition by FGC." In addition, the judge found expressly that the actual sale of FGC's parcel was negotiated between Frank and Castellani, and that Pointer was not involved, and found impliedly that the way the sale was handled was in keeping with the arm's-length and commercially reasonable requirements for transactions under § 5.4.3 of the operating agreement.

4. In 2003, issues began to arise at FGC related to "FGC's deteriorating operating profits and its then precarious cash position." FGC had a revolving credit agreement with Citizens

and contingency of also acquiring the Trust land. Castellani saw the second appraisal, which mentioned that there were plans to aggregate various parcels of land, including FGC's.

[10]This appraisal was not created for FGC or Pointer. In his testimony, Pointer stated that he did not show this appraisal to the members and managers. However, Castellani testified that he did see the appraisal.

Bank that allowed FGC to borrow operating funds when cash sales were at a low point. There was a limit on the amount FGC could borrow based on the value of FGC's receivables and inventory (borrowing base). When FGC bought inventory, the bank gave FGC a letter of credit, thereby reducing its borrowing base.

As part of its landscaping business, FGC bought cobblestones imported from India that required such a letter of credit. In early 2003, the members and managers of FGC, concerned about having enough cash to operate their business in the first three quarters of 2003, decided to defer cobblestone orders until the fall of 2003. Nonetheless, Pointer, concerned that the business would have an insufficient supply of cobblestones for the landscaping season, decided on his own to order a "half ship" of them. The minutes of the board meetings in February and May, 2003, reveal that this shipment was known to the members. In any event, the resulting letter of credit reduced FGC's borrowing base by over $700,000. In addition, the order placed an additional $170,000 cash demand on FGC.

In order to deal with the cash shortage, Pointer took two steps. First, he decided to use a billing method known as "cut-and-store," which was a way to send invoices to customers in advance of shipment, in hopes that payment would be more prompt. In March, 2003, Pointer decided to include the cut-and-store bills in FGC's receivable records (and thereby in the receivable amounts reported to the bank). This was contrary to FGC's agreement with the bank, although Pointer contended that he was unaware of this fact. There is record support for the judge's finding that, "[d]espite concerns expressed by Castellani at trial, it appears that the bank was aware of the cut-and-store situation and was not seriously concerned about it."

Second, Pointer caused FGC to borrow $300,000 from SRI's affiliate, SRM, at an interest rate of fifteen per cent, approximately three times the prime rate. Herbert was aware of the transaction because Pointer, after depositing the check from SRM to FGC, presented her with a copy of it. Castellani and Woodberry were not informed of the loan. The loan was contrary to the bank covenants, and could have constituted an event of default that would have permitted the bank to call in the loan. It also violated the operating agreement. Herbert, the chief financial

officer, did not know the loan violated bank covenants. In addition, the judge found that, at the time Pointer made the loan, Herbert had "hear[d] from the bank about overdrawn checks and called both Castellani and Pointer in a panic. Neither Castellani, Woodberry, nor Herbert, however, offered to loan any money to FGC." Pointer then told Herbert that he did not have money and would ask Frank (i.e., SRI/SRM) for the loan. In any event, Pointer repaid any excess interest to FGC.[11]

When Castellani and Woodberry learned of Pointer's actions, they were concerned about his judgment and ability to manage FGC, but they did not discuss their concerns with him. Instead, they concluded that Pointer deliberately reported the receivables to the bank and had concealed financial problems by borrowing from SRM. In addition, FGC, on a pure performance basis, was projecting a loss for 2003, and was in difficulties with its bank.

As majority owners, Castellani and Woodberry secretly decided to find someone to replace Pointer as the top executive of FGC. In November, 2003, the pair began communicating with the defendant Jonathan Maurer, culminating in Maurer's hiring in January, 2004, as FGC's chief executive officer. The contract Maurer signed stated that Castellani and Woodberry would "use their best efforts to cause the operating agreement to be modified" to allow Maurer to purchase shares up to forty per cent of FGC.[12] Pointer was not informed of the decision to hire Maurer until February, 2004. In addition, Pointer and Castellani executed a memorandum, in February, 2004, that provided that Pointer's employment agreement could continue until at least March 31, 2006. Maurer became a manager of FGC, and started working on March 15, 2004. The record shows that Maurer had Pointer removed from all of FGC's interoffice distribution lists as of March 18, 2004.

In March, 2004, two other actions by Pointer came to the attention of Castellani and Woodberry. During a four-year period, Pointer made political contributions in the amount of $4,825. He wrote personal checks for which he was reimbursed by FGC.

---

[11]On cross-examination, Castellani testified that Pointer reduced the interest rate to a fair rate without any prompting.

[12]Maurer testified that, at the time he signed his employment agreement, he knew that the shares would have to come from Pointer.

This practice had the effect of concealing from Federal and State election authorities contributions by FGC, and predated the sale of the granite business to FGC. In March, 2004, Castellani and Woodberry learned about the contributions. However, the judge found that Pointer's practice was not hidden from FGC, and that in 2003, FGC instituted a company policy, drafted with the assistance of Castellani, that allowed such contributions if either the chairman or the president (i.e., Pointer) approved. The judge concluded that the political contributions were an "exceptionally minor issue."[13] In any event, Pointer reimbursed FGC for the contributions.

The second action by Pointer involved a report done by FGC's accountants concerning the cut-and-store billing activity.[14] The judge found "although [the bank was] somewhat concerned [it] took no action other than to assist FGC and provide it with acceptable forms to accomplish the same thing. The bank never called its loan . . . ."

At a meeting on March 29, 2004, the managers and members tried to talk about these issues with Pointer, but he refused to participate because it was not on the agenda he had submitted for the meeting.[15] Pointer was informed that he was suspended with full pay and benefits. He was also barred from the facility unless there was a prior arrangement with one of the managers.[16]

Without notice to Pointer, the managers had a meeting where they terminated Pointer's employment as of June 30, 2004, by means of a resolution that set forth several allegations (resolution). Pointer was given no opportunity to respond. After Pointer's

[13]One witness, an employee of FGC, testified that Maurer had approved reimbursements for political contributions since Pointer left.

[14]The judge found that the "report quantified the impact of including cut-and-store receivables and reflected the overstatements on FGC's financial statements and the borrowing base certificates submitted to the bank. [It] also quantified the extent to which FGC has borrowed more funds that it was entitled to borrow."

[15]The record shows that Pointer called the meeting to discuss a proposal for him to buy out the other members' shares in FGC, and his concern that he was not forewarned about Maurer's employment. Castellani circulated a competing agenda, containing allegations against Pointer that Pointer claimed arrived at his house while Castellani knew Pointer was away, and to which Pointer objected, in writing.

[16]The judge found that FGC employees "all essentially liked Pointer, which, perhaps, was an irritant to Castellani and Maurer particularly."

termination, Maurer told Pointer that he could no longer represent FGC in any official capacity and would not be allowed direct access to his FGC electronic mail messages.

Pointer sued the defendants, alleging, in relevant part, that the defendants engaged in a freeze-out, committed a breach of their fiduciary duty, violated his employment contract and the covenant of good faith and fair dealing, and interfered with an advantageous relationship. The judge found for Pointer on his claims,[17] and on the defendants' counterclaims, which alleged, insofar as relevant here,[18] breach of fiduciary duty by misappropriating a corporate opportunity and self-dealing; breach of contract; and breach of the implied covenant of good faith and fair dealing in relation to the operating agreement and his employment agreement. The judge found for SRI/SRM on the defendants' counterclaim charging aiding and abetting fiduciary breaches.

The defendants appealed, and Pointer cross-appealed concerning the appropriate remedy for the freeze-out.

*Discussion.* It is uncontested that FGC is a close corporation in that it has "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." See *Brodie* v. *Jordan,* 447 Mass. 866, 868-869 (2006), quoting *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 586 (1975). "Because of the fundamental resemblance . . . to [a] partnership . . . stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another[, that is,] the 'utmost good faith and loyalty.' " *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* supra at 592-593, quoting *Cardullo* v. *Landau,* 329 Mass. 5, 8 (1952).

1. *The freeze-out and termination of employment.* The defendants argue that the judge erred in finding for Pointer on his claims of a freeze-out and wrongful termination of his employment. There was no error.

---

[17]The judge dismissed, without prejudice, two of Pointer's claims against the defendants.

[18]One of the defendants' counterclaims concerned SRI's acquisition of Greystone. They do not press that issue on appeal.

Whatever the advantages of the corporate form, its very structure may "suppl[y] an opportunity for the majority stockholders to oppress or disadvantage minority stockholders [through] a variety of oppressive devices, termed 'freeze-outs.' " *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, supra at 588. Means employed to effectuate a freeze-out include depriving the minority shareholder of offices or employment in the corporation. *Id.* at 589, quoting F.H. O'Neal & J. Derwin, Expulsion or Oppression of Business Associates 42 (1961). In *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 849-850 (1976), this court stated:

> "The denial of employment to the minority at the hands of the majority is especially pernicious in some instances. A guaranty of employment with the corporation may have been one of the 'basic reason[s] why a minority owner has invested capital in the firm.' . . . The minority stockholder typically depends on his salary as the principal return on his investment, since the 'earnings of a close corporation . . . are distributed in major part in salaries' . . . . Other noneconomic interests of the minority stockholder are likewise injuriously affected by barring him from corporate office. . . . In sum, by terminating a minority stockholder's employment . . . the majority effectively frustrate the minority stockholder's purposes in entering on the corporate venture and also deny him equal return on his investment."

*Id.* at 849-850, quoting Symposium — The Close Corporation, 52 Nw. U. L. Rev. 345, 392 (1957), and 1 F.H. O'Neal, Close Corporations § 1.07 (1971). See *Brodie* v. *Jordan, supra* at 869, quoting *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, supra at 588-589 (denial of employment is freeze-out).

A breach of fiduciary duty through a freeze-out also occurs when the reasonable expectations of a shareholder are frustrated. *Bodio* v. *Ellis*, 401 Mass. 1, 10 (1987) (thwarting shareholder's expectation of controlling close corporation).

Nevertheless, majority shareholders "have certain rights to what has been termed 'selfish ownership' in the corporation which should be balanced against the concept of their fiduciary obligation to the minority" permitting them "room to maneuver" and "a large measure of discretion" in, among other things, hiring

and firing corporate employees. *Wilkes* v. *Springside Nursing Home, Inc., supra* at 850-851, and authorities cited. Therefore, where there is an allegation of a breach of fiduciary duty, the court must allow the controlling group to demonstrate a "legitimate business purpose for its action." *Id.* at 851, and cases and authorities cited. The minority stockholder is then allowed to "demonstrate that the same legitimate objective could have been achieved through an alternative course less harmful to the minority's interest." *Id.* at 851-852, and authorities cited.[19]

Applying these principles to the facts in this case, the judge did not err in concluding that Pointer was subject to a freeze-out when Castellani and Woodberry, in violation of their fiduciary duty, secretly hired Maurer in January, 2004, barred Pointer from the FGC, and ultimately fired him as president in June, 2004. In addition, for the reasons cited above, the judge also did not err in concluding that Pointer's actions did not require his termination because less harmful alternatives outweighed "any of the asserted business purposes for the actions that Castellani and Woodberry took in secretly engaging Maurer."[20] The judge stated:

> "[Castellani and Woodberry] attempted to excuse this failure [to inform Pointer about discussions with Maurer] by expressing concern that Pointer would react badly to news that an effort was underway to find someone who would be senior to him in the operations of FGC. If Pointer were to leave before a new executive could be located, [they] knew that there was no one immediately able to step into his role. Certainly neither of them was equipped, nor interested, in doing so. Further, they were concerned that the bank might move their account to workout or call the loan if Pointer left the company."

---

[19]Unscrupulous minority shareholders also may do damage to the interests of the majority. See *Zimmerman* v. *Bogoff*, 402 Mass. 650, 658 (1988), citing *Smith* v. *Atlantic Props., Inc.*, 12 Mass. App. Ct. 201 (1981); *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593 n.17 (1975).

[20]The judge ruled that Herbert failed in her fiduciary duty when she "sat silently by until joining in at the end," signing the resolution of June 29, 2004, terminating Pointer. He also concluded that Maurer was guilty of breaches that began once he replaced Pointer by marching in "lockstep with Castellani and Woodberry against Pointer and joined Castellani and Herbert in Pointer's termination."

There is no merit to the defendants' argument, without citation to authority, that they did not commit a breach of their fiduciary duty because, even though he was barred from FGC without an invitation from another manager, Pointer continued to be a manager and member, hold an equity interest, and receive detailed financial information. At the very least, as the judge found, the freeze-out frustrated Pointer's reasonable expectation that ultimately he would be able to be the owner of FGC. *Bodio* v. *Ellis*, *supra* at 9-10 (freeze-out thwarting shareholder's reasonable expectation is breach of fiduciary duty). Moreover, Pointer did not have full access to his electronic mail messages or interoffice memoranda. There also is no merit to the defendants' argument that termination cannot be a freeze-out. See *Wilkes* v. *Springside Nursing Home, Inc.*, *supra* at 849-450. Nor did the judge err in stating that Pointer had a reasonable expectation of employment as president. The judge found that when Castellani and Woodberry secretly decided to replace Pointer, one of the reasons they kept the information from Pointer was because they needed someone to run FGC in the interim and neither Castellani nor Woodberry was equipped or interested. Although it is true that the employment contract could be terminated and was extended only until March, 2006, as discussed *infra*, here it was wrongfully terminated and thus frustrated Pointer's reasonable expectation in remaining president.

The defendants claim that the judge also erred in holding that Pointer did not commit a breach of his employment contract. This argument has no merit.

The resolution terminating Pointer's employment enumerated the grounds on which that termination was based. In relevant part, it stated that Pointer had violated his employment agreement and the operating agreement, and engaged in acts of malfeasance that materially injured FGC by forming a fifty per cent ownership in SRI/SRM and engaging in certain real estate transactions[21]; inadequately compensating for resources FGC provided to Pointer while he conducted SRI/SRM business; causing FGC to borrow $300,000 from SRM at exorbitant interest rates; including cut-and-store billing in the receivables that resulted in false reports to the bank; and reimbursing himself for political contributions. Given the judge's findings recited *supra*, he did

---

[21]The transaction that concerns us involves FGC's parcel in Milford.

not err in concluding, inter alia, that the $300,000 loan helped FGC; Pointer had a right, even under his employment contract, to conduct SRI/SRM business to the extent he reasonably determined was necessary and everyone at FGC was aware of this; the cut-and-store reporting was known to the bank and FGC was not harmed thereby; and, although the political contributions should not have been handled in the way they were, Pointer had the power to make contributions in FGC's behalf and all the other owners had to do was talk to Pointer about his practices.[22]

The judge also did not err in determining that the defendants' claim that Pointer should have revealed to the other members and managers that the purchase of FGC's parcel was part of a larger real estate venture and that Pointer was a fifty per cent owner of SRI/SRM was contrived. The judge found that no one from FGC other than Pointer had any interest in real estate development; that under FGC's operating agreement, for FGC to engage in real estate transactions, approval of 66.7 per cent of the members was required, and the defendants presented no evidence that demonstrated that FGC was deviating from its operating agreement; and that Castellani knew that SRM was aggregating land for development. In fact, the others knew that there was discussion about using some land for a golf course. Castellani sent Pointer a newspaper article involving a golf course developer sued over "turtles."

The defendants argue that they could not have demonstrated that FGC was interested in real estate when they did not know that Pointer was a fifty per cent owner of SRM, and thus, they argue, they did not know that the opportunity was even available to them. However, the judge implicitly found that they knew Pointer was an owner of SRI and that SRM was buying the parcel; indeed, Pointer signed the purchase and sale agreement and deed for FGC's parcel as a manager of SRM.

As the judge found, Castellani, Woodberry, Herbert and Maurer owed Pointer, who was a forty-three per cent owner of

---

[22]Several other issues were raised in the resolution. The judge concluded that they were not only "not a substantial feature" at trial but also that "none . . . even approach[es] a basis for termination for cause." The defendants do not discuss these issues in their brief, and thus we do not consider them. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

FGC, "real substance and communication, including efforts to resolve *supposed* complaints by less drastic measures than termination. But such efforts never truly were attempted." (Emphasis added.) The judge called some of the charges "contrived" or not "credible," and concluded that, by the time the resolution was written, the others were simply trying "to find a way to get rid of Pointer."[23]

The defendants argue that because Pointer was president under an employment contract, the terms of the contract control rather than their fiduciary duty. Even assuming that this assertion has merit, the cases on which the defendants rely are easily distinguished. One involved a corporation whose stock was publicly traded. See *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 273 (2007). Two concerned terminations that were consistent with applicable employment contracts. See *Merola* v. *Exergen Corp.*, 423 Mass. 461, 465-466 (1996) (no breach of fiduciary duty in closely held corporation where plaintiff was employee at will, bought corporation's stock but was not required to as condition of employment, was terminated in accordance with his employment contract, and was adequately compensated for his stock); *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 406-409 (1995) (termination of shareholder and purchase of his stock consistent with terms of applicable contracts, including proper notice). Here, there is support for the judge's conclusion that Pointer did not violate his employment agreement.

2. *Usurpation of a corporate opportunity and self-dealing.* The defendants' counterclaims against Pointer for breach of fiduciary duty in usurping a corporate opportunity and self-dealing concern the sale, in 2000, of FGC's parcel and the larger plan that Frank offered Pointer to assemble multiple parcels of land in Milford.

---

[23]We take the judge's conclusion that the allegations against Pointer were not grounds for his termination to mean that the defendants have not established a legitimate business purpose for the termination. See *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851-852 (1976) (where court is asked to settle dispute, it must "weigh the legitimate business purpose, if any, against the practicality of a less harmful alternative"). In the one area where the judge found that Pointer engaged in any misconduct, his political contributions, we agree with the judge that termination was not necessary; a simple discussion would have been enough. In any event, Pointer reimbursed FGC.

The defendants contend that the judge erred in concluding that "all transactions involving the Milford [p]arcel, involving as they do matters relating to a significant real estate development, are not a corporate opportunity of FGC." Relying on *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997), the defendants argue that, because the judge found that Pointer was offered the opportunity to participate in Frank's plan for development of several parcels of land in Milford but Pointer never offered it to FGC, "[n]othing more is needed to establish that Pointer is liable for usurping a corporate opportunity." There was no error.

In order for liability to attach for usurpation of a corporate opportunity, the claimant must prove that the opportunity belonged to the business. That is, " 'a director or senior executive [must become] aware' either in connection with performing the functions of those positions, or '[t]hrough the use of corporate information or property, [that] the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation.' " *Demoulas* v. *Demoulas Super Mkts., Inc.*, *supra* at 530, quoting Principles of Corporate Governance § 5.05(b)(1) (1994). Here, the judge found that the language in FGC's operating agreement directly enumerating a limited business purpose, see note 7, *supra*, and explicitly allowing any member the right "to conduct any other business or activity whatsoever," freed Pointer "from such liability relating to an opportunity not involved within FGC's line of business."[24]

The defendants argue that pursuant to the *Demoulas* case, the judge was bound by a definition of corporate opportunity that "leave[s] little room for [a] director to appropriate any opportunity conceivably advantageous to [its] corporation, without its consent." *Demoulas* v. *Demoulas Super Mkts., Inc.*, *supra* at

---

[24]The defendants argue that the judge's reliance on § 5.4.3 of the operating agreement is misplaced because as a manager, Pointer was bound by § 5.4.1, which states that he owed FGC a fiduciary duty to the same extent "as a director would have to a corporation of which he is a member of the Board of Directors." This argument fails because in order to find that Pointer committed a breach of his fiduciary duty on this particular counterclaim, the judge first had to find that a corporate opportunity existed. See generally *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 535 (1997) ("nondisclosure of a corporate opportunity is, in itself, unfair to a corporation and a breach of fiduciary duty").

530, citing Brudney & Clark, A New Look At Corporate Opportunities, 94 Harv. L. Rev. 997, 1032 n.108 (1981). This argument has no merit because, unlike the situation in the *Demoulas* case, the operating agreement here clearly states the limited business purpose of FGC and envisions its shareholders carrying on businesses outside FGC. In addition, in the *Demoulas* case, the businesses at issue were directly related to businesses in which Demoulas was engaged. *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 506, 507, 534, 538-539, 542-543 (usurpation of corporate opportunity where new supermarkets opened under "Market Basket" name and development of real estate by displacing older companies). See *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 375 (1951) (machine to sharpen saw blades within plaintiff company's capability and goal of enlarging field of manufacture). Moreover, the judge specifically found that, other than Pointer, no other member of FGC had any interest in the real estate (which is the reason Pointer and Frank established SRI to buy Pioneer's Greystone).[25] The record supports the judge's conclusion that the others knew enough about FGC's parcel and its relationship to the development project to have taken action if interested.[26] As discussed, the information was in minutes of board meetings, appraisals, and Pointer's memorandum of October, 2000. Moreover, there is support in the record for the judge to conclude that the plan to develop the parcels in Milford was no secret in the larger community where FGC operated.

Concerning the argument that Pointer engaged in self-dealing when SRM bought FGC's parcel, the defendants argue that the judge erred in concluding that the sale was consistent with fundamental fairness because Pointer pursued an unfair process by not revealing that he owned a fifty per cent interest in SRM or that SRM wanted to acquire the property at a discount, and failed to get the best possible price for FGC's parcel. There was no error.

---

[25]In their reply brief, the defendants argue that Frank's plan fit the definition of a "corporate opportunity" because the judge found that "Pointer knew that the [plan] was a real and substantive opportunity." That the opportunity was substantial does not compel a conclusion that it was a corporate opportunity for FGC.

[26]Under the operating agreement, that action would have required the approval of 66.7 per cent of the managers to expand FGC's business interests.

There is no question that the sale of FGC's parcel was a corporate opportunity because FGC had decided to sell the real estate it bought from Pioneer. Where a fiduciary is taking advantage of an opportunity for his own profit, he has the burden to show that all material facts were disclosed and that his actions did not harm the corporation and were fundamentally fair. *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 529-530, quoting *Meehan* v. *Shaughnessy*, 404 Mass. 419, 441 (1989).

Here, although Pointer did not reveal that he owned fifty per cent of SRM, there is adequate evidence in the record to support the judge's conclusion, consistent with the operating agreement, that Castellani negotiated directly with Frank, that Pointer did not participate in the vote on the deal, and that $300,000 was a commercially reasonable price. The record shows that the other members knew Pointer owned part of SRI/SRM and that Pointer and Frank were assembling parcels of land for development. It is true that there was no disclosure that Frank would take $300,000 or that SRM was pursuing the parcel at a discount. However, as discussed, the record shows that, in his memorandum of October 6, 2000, Pointer stated that the existing option was for $475,000. He also stated the amounts of two other estimates and explained why FGC should "discount" the option price.

The minutes of the meeting in which the sale of FGC's parcel was discussed reveal that members understood that they could hold out for a higher price, but instead chose to sell rather than take a chance that the permitting process would be successful. Moreover, although an expert for the defendants testified that FGC's parcel could have sold for $700,000, the judge was entitled to reject that testimony and rely instead on the opinion of the plaintiff's expert that $300,000 was a commercially reasonable price. Given that the price was commercially reasonable, it follows that Pointer did not harm FGC when Castellani and Frank settled on that price. The judge did not err in concluding that the transaction was fundamentally fair.[27]

3. *Interference with advantageous relationship.* The judge

---

[27]Because we conclude that the judge did not err in denying the defendants' counterclaims of usurpation of a corporate opportunity and self-dealing, we need not address the defendants' argument that the judge erred in rejecting their counterclaim against SRI/SRM for aiding and abetting Pointer in this regard.

found that Castellani, Woodberry, Herbert, and Maurer were liable for interference with Pointer's employment contract with FGC, because he concluded that the defendants terminated Pointer with "improper means and motives." The defendants argue that they had cause to terminate Pointer and that, because Pointer did not show that the defendants acted with actual malice, their actions were privileged.

Corporate officers have freedom of action; there must be actual malice to hold corporate directors personally liable for interference with an advantageous relationship. *Blackstone* v. *Cashman*, 448 Mass. 255, 260 (2007), quoting *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981), *S.C.*, 391 Mass. 333 (1984). Actual malice is defined as showing spiteful, malignant purpose with no legitimate corporate purpose. *Blackstone* v. *Cashman*, *supra* at 261, quoting *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992). Here, we have concluded already that the judge did not err in finding that the defendants' claim that they terminated Pointer for cause was contrived. There was no error in finding the defendants liable.

4. *Indemnification.* Under § 5.5.3 of the operating agreement, FGC must "indemnify, defend and hold harmless" the managers and members unless their action or inaction "was the result of active and deliberate dishonesty." See G. L. c. 156C, § 8. The defendants argue that this limitation applies regardless of the outcome of the case and that the judge's findings concerning Pointer's behavior lead to the conclusion that Pointer was, at the very least, dishonest.

As the judge stated in a written memorandum and order on several posttrial motions, "Contrary to the [d]efendants' argument, nowhere in this [decision] are there findings that Pointer committed actions in bad faith or that were the result of active and deliberate dishonesty." There was no error.[28]

5. *Remedy for freeze-out.* Having found Castellani, Woodberry, Herbert, and Maurer individually liable to Pointer for a

---

[28]In their brief, the defendants allege bias by the judge. We have reviewed the portions of the transcripts referenced in the brief and conclude that the judge's statements, made when he was discussing the admissibility of certain evidence, that he did not find a defense theory credible and statements about his view of the duty that partners in a close corporation owe each other, did not demonstrate bias. The judge stated that he would consider everything, including the defendants' assertions when the time came.

freeze-out, the judge gave the parties ninety days to try to reach a binding agreement under which one side or the other would buy out the shareholder interests of the other. Failing that, he ordered FGC to be liquidated by a receiver and each party to be awarded the net proceeds in accordance with their respective shareholder interests under the operating agreement.[29] The defendants appealed from the judge's entire judgment, including the remedy; Pointer did not appeal. The parties did not agree to a buyout. The judge stayed that portion of the judgment ordering liquidation, pending the appeal. In his order, the judge noted that he was aware of our decisions in *Brodie* v. *Jordan*, 447 Mass. 866, 870-871, 872-873 (2006), quoting *Zimmerman* v. *Bogoff*, 402 Mass. 650, 661 (1988) (remedy for freeze-out is to put minority shareholder in same position he or she would have been in had freeze-out not occurred; absent agreement between shareholders, court cannot force buyout of minority shareholder's stock), and *Bernier* v. *Bernier*, 449 Mass. 774 (2007) (discussing valuation of shares of S corporation).

In July, 2008, approximately eight months after judgment entered, Pointer filed a motion for relief from judgment under Mass. R. Civ. P. 60 (b) (5) or (6), 365 Mass. 828 (1974). He asked the judge to modify the remedy for the freeze-out because, he argued, FGC was insolvent and, therefore, a forced sale would yield him nothing. He requested that the remedy be modified to order the defendants to pay him approximately $3.6 million dollars, which, according to an expert who testified for Pointer at trial, was 43.3 per cent of the value of FGC when the freeze-out occurred. In return, Pointer would tender his stock.

Because the trial judge had retired, another judge ruled that the relief Pointer sought was contrary to the *Brodie* decision. As the judge stated, the operating agreement does not require any buyout during the lifetime of a shareholder.

Both sides make numerous arguments concerning the appropriate remedy for the freeze-out. We need not discuss them because we conclude that the trial judge's order for a forced sale of FGC violated our holding in the *Brodie* decision. Because we held that a forced buyout of a shareholder was improper without some authorization from shareholders, it would be inconsistent

---

[29]The judge also ordered an alternative remedy, discussed *infra*.

for us now to hold that a forced sale is proper. *Brodie* v. *Jordan*, *supra* at 873 n.7 (calling involuntary dissolution "drastic remedy"). Nevertheless, Pointer is entitled to damages or other equitable relief from Castellani, Woodberry, Herbert, and Maurer, which will put him in the position he would have been in had the freeze-out not occurred, and compensates him for the denial of his reasonable expectations. *Id.* at 871, 873.

Anticipating that this court would conclude that a forced sale of FGC violated the holding in the *Brodie* decision, the trial judge fashioned an alternative remedy, stating he "would grant to Pointer an order for his reinstatement as [p]resident of FGC, together with back pay for salary lost at the rate he was earning at the time of his discharge to the date of his reinstatement, indemnification for his reasonable attorney's fees and costs in litigating this action, along with appropriate injunctive relief to enable him to resume and continue in the future, under reasonable regulation by the FGC members and managers, in his position as [p]resident." However, since the trial judge fashioned this remedy, it appears that circumstances have changed, not the least of which is that FGC may have been sold. We are constrained in fashioning a remedy here, as Pointer sought both monetary damages and equitable relief, and the appropriate remedy depends on further factual findings. Therefore, the case is remanded for further proceedings to determine whether it is possible to implement the trial judge's alternative remedy.[30] If not, the judge should fashion another remedy, one that presumably would include monetary damages and other equitable relief that the judge deems appropriate.

*Conclusion.* For the reasons set forth above, we affirm the decision of the trial judge insofar as he found for Pointer on his claims and on the defendants' counterclaims.[31] We affirm the denial of Pointer's motion for relief from judgment that requested a forced buyout of his shares of FGC. The case is remanded for further proceedings consistent with this opinion concerning an appropriate remedy for the freeze-out.

*So ordered.*

---

[30]Although it now may be moot, in his brief Pointer mentioned a possibility that "a remnant of FGC may remain in business for two years."

[31]Other remedies the judge ordered are not raised in this appeal.