# Selmark Associates, Inc.[1] *vs.* Evan Ehrlich.

Worcester. November 7, 2013. - March 14, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Corporation,* Close corporation, Board of directors, Stockholder. *Damages,* Breach of fiduciary duty, Breach of contract. *Contract,* Performance and breach. *Fiduciary. Consumer Protection Act,* Unfair or deceptive act, Availability of remedy, Transactions between partners, Employment. *Practice, Civil,* Instructions to jury, Injunctive relief, Special questions to jury. *Injunction. Employment,* Termination.

In a civil action involving shareholders and directors of close corporations, the judge did not err in denying a motion for judgment notwithstanding the verdict on the defendant's counterclaim alleging breach of fiduciary duty, where the record contained ample evidence from which the jury could infer that, in terminating the defendant from his employment, the moving parties (a close corporation that was a majority shareholder of the close corporation in which the defendant was a minority shareholder and that employed him; and the principal owner of the majority shareholder close corporation) violated the duty of utmost good faith and loyalty owed to the defendant as a minority shareholder [536-540]; further, a purported contest of the award of damages on this claim did not rise to the level of acceptable appellate argument [540].

In a civil action involving shareholders and directors of close corporations, the judge did not err in denying a motion for judgment notwithstanding the verdict on the defendant's counterclaim alleging breach of contract when he was terminated from his employment with the close corporation of which he was a minority shareholder, where ample evidence was presented from which the jury could have found that the defendant acquired the stock required to permit conversion of his interest in that close corporation to an interest in a second close corporation (the majority shareholder in the close corporation that employed the defendant), and that the refusal to allow him to do so was a breach of the agreement permitting such conversion [540-542]; however, this court remanded the matter for further proceedings on the issue of the award of damages on the claim of breach of contract [542-546].

In a civil action involving shareholders and directors of close corporations, the judge, in instructing the jury, did not err in declining to inform them that fiduciary duties can be displaced by contract, where the instructions adequately and correctly covered the applicable legal principles of breach of contract and breach of fiduciary duty; further, the jury were not forced

_____
[1]On behalf of Marathon Sales, Ltd.

to decide legal questions without guidance from the trial judge; finally, the special verdict questions that the jury were asked to answer did not conflate different theories of recovery. [546-549]

In a civil action involving shareholders and directors of close corporations, the judge erred in entering judgment in favor of the defendant on his claim of unfair or deceptive acts or practices in violation of G. L. c. 93A, and in awarding double damages, attorney's fees, and costs, where the claims raised stemmed from or concerned a single venture of which all the parties were a part, and G. L. c. 93A does not apply to employment and shareholder relationships. [549-551]

In a civil action involving shareholders and directors of close corporations, alleging, inter alia, that the defendant committed a breach of his fiduciary duty in soliciting the principals of one of the close corporations at issue for a rival after the defendant's employment with the other close corporation at issue had been terminated, the judge did not err in declining to instruct on the defendant's right to compete or in denying his motion for judgment notwithstanding the verdict. [551-553]

In a civil action involving shareholders and directors of close corporations, the judge did not err in declining to award multiple damages on the defendant's claim of breach of contract [553]; further, the judge did not abuse his discretion in declining to expand the scope of posttrial injunctive relief [553].

CIVIL ACTION commenced in the Superior Court Department on April 22, 2008.

The case was tried before *John S. McCann*, J., and motions for posttrial relief were heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Ronald W. Dunbar, Jr.*, for the plaintiffs.

*Robert D. Cohan* for the defendant.

BOTSFORD, J. This case is, like many, factually intense. On appeal, however, the primary legal issues raised concern the duties fellow shareholders and directors of close corporations owe to each other in a context where contractual agreements exist defining in part their relationship; also raised are questions about damages.

For the reasons discussed hereafter, we affirm the jury verdict in favor of Selmark Associates, Inc. (Selmark), and Marathon Sales, Ltd. (Marathon), on their breach of fiduciary duty claim against Evan Ehrlich. We also affirm the verdict in favor of Ehrlich on his breach of fiduciary duty counterclaim against Selmark and David Elofson. We conclude that, as the jury found,

Ehrlich is entitled to recover on his breach of contract counter-claim, but we vacate the award of damages and remand the case to the Superior Court for a new trial on the issue of contractual damages. Additionally, we conclude that Ehrlich is not entitled to recover under G. L. c. 93A, and his c. 93A counterclaim must be dismissed.

1. *Background.* What follows is a summary of the factual background of the case, taken from the evidence at trial. We reserve for later discussion additional facts relevant to the issues raised on appeal.

Selmark and Marathon are both closely held Massachusetts corporations that operate as what the sales industry calls manufacturer's representative companies. Both provide outsourced sales support to companies manufacturing electronic components that lack their own sales staff; these manufacturers are Marathon's and Selmark's customers or "principals." Andrea Terenzi established Marathon in 1980 and remained its owner and sole shareholder until the transactions at issue in this case. In 1997, Terenzi hired Ehrlich as a salesperson for Marathon and the two had a verbal agreement under which, if all went well, Ehrlich would have an option to become an owner and manager of Marathon. Ehrlich proved to be a high-performing salesperson and maintained a good relationship with Terenzi. As Terenzi's retirement approached, Terenzi was looking for a successor and a way to sell his company, and wanted Ehrlich to have an ownership interest in it. This led to nearly two years of negotiations among Terenzi, Ehrlich, and Selmark for the sale of Marathon. At the time, Selmark was owned by Elofson and Clifton Snuffer, both former Selmark sales managers who purchased the business from Elofson's father on his retirement in 1993.[2]

On or about September 14, 2001, Ehrlich entered into a series of written agreements (collectively, the agreements) providing for the gradual sale of Marathon by Terenzi to Selmark and Ehrlich. The agreements comprise four contracts referred to as

---

[2]At the time the agreements were negotiated in the two-year period before September, 2001, David Elofson owned fifty-one per cent of Selmark Associates, Inc. (Selmark), and Clifton Snuffer owned forty-nine per cent. After Snuffer's retirement in 2005, Elofson became sole owner and shareholder of Selmark.

follows: (i) stock purchase and redemption agreement (purchase agreement); (ii) employment agreement; (iii) conversion agreement; and (iv) stock agreement.

a. *The agreements.* We set forth the essential terms of each agreement:[3]

i. *Purchase agreement.* The purchase agreement detailed the terms of sale of Marathon to Selmark and Ehrlich. It provided for the gradual acquisition of Marathon stock by the two purchasers through monthly payments to Terenzi, pursuant to two promissory notes.[4,5] Upon full payment to Terenzi, Selmark would own fifty-one per cent of the Marathon stock, and Ehrlich the remaining forty-nine per cent. Under the terms of the purchase agreement Marathon bore primary responsibility for the monthly payments to Terenzi.[6] However, if Marathon's monthly cash flow was insufficient to pay, Ehrlich and Selmark, as separate coguarantors, were responsible for the monthly shortfall. Section 5 of the purchase agreement detailed the procedures in the event of a shortfall and the steps to be taken by Terenzi to notify Ehrlich and Selmark of their respective payment obligations. Specifically, section 5 provided for the parties to conduct a semiannual review of Marathon's monthly cash flow on March 1 and September 1 of each year and, in the event of a shortfall in the previous six months, Terenzi was to notify Ehrlich and Selmark by sending a "shortfall notice" pursuant to the notice provisions of Section 24 of the purchase agreement. If either Selmark or Ehrlich did not make the payment for which it or he was responsible within the required time frame, Terenzi could declare default on the nonpayor by sending a default notice. The nondefaulting party then had the option to cure the default by making the payment due from the

---

[3]Relevant provisions are considered in greater detail in our discussion of the issues, *infra.*

[4]At the time this litigation began, the first note, note A, had been paid in full and the second, in part.

[5]The purchase agreement also stated that Terenzi would remain an employee of Marathon Sales, Ltd. (Marathon), until 2003.

[6]The parties agree that Marathon paid Terenzi from profits that otherwise would have flowed to its owners in the form of bonuses. Ehrlich estimated that, from 2001 to 2007, he forwent approximately $360,000 in profits and bonuses that went toward his ownership interest in Marathon.

defaulting party and acquiring the Marathon stock attributable to that payment for itself. If a default occurred and was not cured, the purchase agreement allowed Terenzi to recover all Marathon stock, including that which was previously purchased.

ii. *Employment agreement.* The employment agreement was attached to the purchase agreement, and was between Ehrlich and Marathon. The agreement provided for an initial fifteen-month term, until December 31, 2002, with extension possible on the written agreement of the parties. Under the employment agreement's terms, Ehrlich became the vice-president of Marathon and potentially a director, and could only be terminated for cause. If the agreement was not extended, at the conclusion of the initial contract term, the agreement would terminate and Ehrlich would be required to resign as an officer and director of Marathon.

iii. *Conversion agreement.* Under the conversion agreement, Ehrlich had the option, once he and Selmark fully paid off Terenzi for the purchase of Marathon, to convert what would then be Ehrlich's forty-nine per cent interest in Marathon into a twelve and one-half per cent ownership interest in Selmark.[7] If Ehrlich exercised this option, Selmark would then acquire full ownership of Marathon.

The conversion agreement also required that, upon conversion, Selmark offer Ehrlich an employment agreement that would provide "for compensation, bonuses, expense payments, and benefits consistent with his percentage ownership of [Selmark]."[8] Independent of employment, upon conversion, Ehrlich was to become an officer of Selmark and member of its board of directors.

iv. *Stock agreement.* The stock agreement, attached to the conversion agreement, would become operative if and when Ehrlich paid Terenzi his full share of the Marathon purchase price pursuant to the terms of the purchase agreement, and

---

[7] The conversion rate was calculated based on the fact that because Selmark was four times the size of Marathon, Ehrlich's forty-nine per cent interest in Marathon equaled approximately twelve and one-half per cent of Selmark.

[8] The conversion agreement also states, however, that the conversion agreement itself does not "constitute an employment agreement between Ehrlich and Selmark."

opted to exercise his right to convert Marathon stock for Selmark stock under the conversion agreement. Upon those events happening, the stock agreement, a contract between Ehrlich and Selmark, would govern Ehrlich's rights as a minority stockholder of the company. The stock agreement provided both parties with the opportunity to end the business relationship through the sale of Ehrlich's stock, subject to certain financial penalties for the party exercising this right. Specifically, Selmark would possess a "call right" pursuant to which, on the occurrence of certain conditions, the company could purchase all of Ehrlich's stock.[9] If Selmark were to exercise this call right, Ehrlich would receive a premium purchase price of 110 per cent of the "stock purchase value."[10] Similarly, Ehrlich possessed a "put right," where, at any time, he could sell, and Selmark would be obligated to purchase, all of his Selmark stock. However, if Ehrlich chose to exercise his put right, he would only receive ninety per cent of the stock purchase value.

b. *Subsequent events.* After the agreements were executed, Marathon and Selmark remained separate entities, but presented themselves as Selmark to the outside world. Marathon moved into the Selmark office space, but maintained separate bank accounts and tax returns. The two companies used each other's sales forces to sell one another's product lines, and they did not compete with each other. Ehrlich's business card identified him as vice-president of Selmark even though in fact he was an employee and vice-president of Marathon pursuant to the employment agreement.

Ehrlich's employment agreement expired by its terms on

---

[9]These conditions included bankruptcy, long-term disability, death, breach of the employment or conversion agreements, and "[t]he termination of [Ehrlich's] employment with the Company in accordance with the Employment Agreement by and between the Company and [Ehrlich] dated [blank date], 2001." The stock agreement defines the term "Company" to mean Selmark, but no employment agreement between Selmark and Ehrlich — dated in 2001 or at any other time — appears to exist.

[10]The stock agreement defines the "stock purchase value" as "twelve and one half percent (12 ½ %) of the average gross annual commission revenue of [Selmark] for the previous thirty-six (36) months, plus forty-nine percent (49%) of the Working Capital . . . [as defined in the purchase agreement] of Marathon . . . as of the Conversion Date . . . [as defined in the conversion agreement]."

December 31, 2002, because the parties had not agreed to extend it in writing. Nevertheless, after that date Ehrlich remained an employee of Marathon and retained his position as vice-president. In 2003, Terenzi retired from Marathon, and Ehrlich began to report directly to Elofson. Ehrlich received no complaints from Elofson about his job performance. Ehrlich brought in new business, and was consistently the number two (second only to Elofson) producer of commission income among all Selmark and Marathon sales representatives.

In July of 2007, Ehrlich notified Elofson that he intended to accelerate his final payments to Terenzi and complete the payment due on his forty-nine percent share of Marathon stock by December, 2007. According to Elofson, Ehrlich's announcement prompted Elofson to contemplate the future of Selmark, and then to conclude that he did not see Ehrlich as a successor or want him involved in the future of the business.[11] On October 26, 2007, Ehrlich and Elofson met at a local hotel, purportedly to discuss the details of the Marathon payoff. At that meeting, Elofson informed Ehrlich that his employment with Marathon was terminated, effective immediately, and presented Ehrlich with a termination letter. The letter contained an offer by Selmark to purchase Ehrlich's forty-nine per cent ownership interest in Marathon for the same price he would have received had he converted his Marathon shares into Selmark stock and Selmark then exercised its call rights pursuant to the stock agreement.[12] The letter also informed Ehrlich that, due to decreased cash flow, Marathon would have insufficient funds to complete its payments to Terenzi and that Ehrlich was responsible for

---

[11]Elofson acknowledged at trial that he was never contractually obligated to make Ehrlich a successor or to grant Ehrlich control of Selmark. If Ehrlich had paid Terenzi in full and then exercised his right to convert his Marathon stock, Ehrlich would have acquired only a twelve and one-half per cent ownership interest in Selmark and an offer of employment, which carried no succession rights.

[12]On this point, the termination letter stated:

"The net effect to you of this buy-out offer is that you will receive the same purchase price for your Marathon stock as you would be eligible to receive for your Selmark stock, had you exercised your conversion rights (when eligible to do so). This 'short-cut' mechanism allows you to achieve similar sales proceeds, without the necessity of going through the conversion process."

forty-nine per cent of the shortfall.[13] As he was driving home from that meeting, while speaking to his family on his cellular telephone that was paid for by Marathon, Ehrlich's telephone service was disconnected. That same day, Elofson also sent a letter to all the Selmark and Marathon principals, notifying them of Ehrlich's termination and characterizing it as a "failed relationship."

After his termination, Ehrlich received approximately $25,000 in severance from Selmark, but did not cash in his Marathon stock under the terms offered in the termination letter. He remained a minority shareholder of Marathon, but had no access to, or involvement in, the business workings of the company.

In November, 2007, Ehrlich took a job as a salesperson with Tiger Electronics (Tiger), a competing manufacturer's representative company.[14,15] At Tiger, Ehrlich contacted, and met with, several Marathon principals, attempting to solicit their business.[16] After Ehrlich met with a company known as PKG, PKG terminated its relationship with Marathon and became a Tiger principal.[17]

Following his termination, Ehrlich did not believe that Marathon had insufficient funds to make its remaining payments to Terenzi.[18] He expressed these doubts to Terenzi but

[13] Attached to the letter was a schedule of remaining payments due to Terenzi, indicating that Ehrlich was responsible for monthly payments to Terenzi until April, 2008, totaling $25,483.62.

[14] Ehrlich's salary at Tiger Electronics (Tiger) was $70,000, plus sixty per cent of any commissions exceeding $70,000. At trial, the parties stipulated that Ehrlich's total annual compensation at Marathon for 2001 and 2004 to 2006 was the following: $92,700 in 2001; $236,100 in 2004; $240,200 in 2005; and $202,200 in 2006. The stipulation did not include compensation figures for 2002 and 2003.

[15] As of the date of trial, Ehrlich remained employed by Tiger.

[16] At trial, Ehrlich argued that although the companies he contacted were Marathon principals in the sense that commissions went into Marathon's account, they were technically Selmark principals, because each company's contract was with Selmark.

[17] Elofson estimated that the loss of PKG cost Marathon $225,000 in total lost commissions, eighty per cent of which would have been profit.

[18] At trial, the parties vigorously disputed whether Marathon had sufficient funds to pay Terenzi and presented voluminous financial documents in support of their arguments. Given our resolution of the issues raised on appeal, discussed *infra*, we do not address this issue.

assured him that, if it were proven that Marathon had insufficient funds, he would honor his commitment to pay. Although Selmark paid its portion of the outstanding amount due to Terenzi on a monthly basis after Ehrlich was terminated, Ehrlich did not. Selmark completed its remaining payments to Terenzi by May, 2008, so that the only outstanding balance owed was Ehrlich's portion. In the fall of 2008, Terenzi and his attorney sent a series of messages via electronic mail (e-mail) to Ehrlich, Elofson, and their counsel, demanding payment. Terenzi, however, never sent a shortfall notice or default notice as prescribed by the purchase agreement.[19] On February 2, 2009, Selmark sent the remaining payment to Terenzi to "cure" what it characterized as Ehrlich's "default." Three days later, on February 5, after he learned of Selmark's payment, Ehrlich wired the same amount to Terenzi's attorney. Terenzi accepted payment from Ehrlich, and never cashed Selmark's check.

On June 1, 2009, Ehrlich sent Elofson notice of his intention to exercise his conversion rights pursuant to the conversion agreement, and requested issuance of his twelve and one-half per cent stock interest in Selmark. Through counsel, Selmark notified him that he was not entitled to convert because Selmark had "cured [Ehrlich's] default of his obligations" pursuant to the purchase agreement. Selmark then claimed for itself the portion of stock attributable to the amount on which Ehrlich allegedly had defaulted, and Ehrlich never acquired the forty-nine per cent interest in Marathon necessary to exercise his conversion rights.

*c. Procedural history.* On April 22, 2008, Selmark and Marathon filed a complaint, alleging that by soliciting and acquiring Marathon principals for Tiger, Ehrlich committed a breach of his fiduciary duties to Marathon.[20] In response, Ehrlich asserted thirteen counterclaims against Selmark, Marathon, and Elofson (collectively, the Selmark parties).[21,22]

---

[19]Terenzi testified that he felt the messages via electronic mail provided more than sufficient notice to Ehrlich and Selmark of their obligation, and that, as friends, they would "hold to their word" and pay.

[20]The complaint included a claim that Ehrlich violated the noncompete provision of the employment agreement, but the plaintiffs did not pursue this claim at trial.

[21]On July 15, 2008, the judge allowed Ehrlich's motion to add Elofson as a defendant in counterclaim.

[22]Ehrlich's counterclaims alleged: (1) breach of written contract; (2) breach

The case was tried before a jury in 2011. The jury returned their verdict by answering special questions. They found that Ehrlich committed a breach of his fiduciary duty to Selmark and Marathon, and awarded $240,000 in damages. As for Ehrlich's counterclaims against the Selmark parties, the jury found that Selmark and Elofson (but not Marathon) committed a breach of contract with Ehrlich,[23] and awarded Ehrlich $1,537,163 in damages. Additionally, they found Selmark and Elofson (but not Marathon) committed a breach of their fiduciary duties to Ehrlich, and awarded $221,408 in damages. The jury determined that all the Selmark parties engaged in unfair or deceptive acts or practices in violation of G. L. c. 93A, again awarding $221,408 in damages. The trial judge later doubled the c. 93A damages and pursuant to c. 93A, § 11, awarded attorney's fees and costs.[24]

After the verdict, the trial judge allowed Ehrlich's motion for injunctive relief to preserve the assets of Selmark and Marathon pending appeal. Ehrlich later moved to amend his motion to include in the preservation order Elofson's corporate and personal assets; the judge denied the motion to amend.

Judgment entered on October 13, 2011. Ehrlich subsequently filed a motion for judgment notwithstanding the verdict (judgment n.o.v.) and the Selmark parties filed a joint motion for judgment n.o.v., and a motion to amend judgment by remittitur or, in the alternative, a motion for new trial. After rehearing, both parties' posttrial motions were denied on January 4, 2012.

of implied-in-fact contract; (3) breach of contract by estoppel; (4) unpaid wages, in violation of G. L. c. 149, § 148; (5) breach of the implied covenant of good faith and fair dealing; (6) fraud; (7) negligent misrepresentation; (8) breach of fiduciary duty; (9) unjust enrichment; (10) negligent infliction of emotional distress; (11) intentional infliction of emotional distress; (12) unfair or deceptive practices, in violation of G. L. c. 93A; and (13) declaratory relief. Ehrlich later withdrew this last claim.

[23]The jury were not asked to identify the specific contract or agreement that they determined was the subject of the breach, see *infra*.

[24]As to the remaining counterclaims, not relevant to the issues raised on appeal, the jury determined: (1) Selmark and Elofson (but not Marathon) negligently or intentionally inflicted emotional distress on Ehrlich, but awarded no damages; (2) the Selmark parties were unjustly enriched at the expense of Ehrlich, and awarded $34,200 in damages; and (3) the Selmark parties were not liable on Ehrlich's claims for violation of the Wage Act, fraud, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing.

The parties cross-appealed; we granted Ehrlich's application for direct appellate review.

2. *Discussion.* a. *The Selmark parties' appeal.* On appeal, the Selmark parties focus first on Ehrlich's successful counterclaims for breach of fiduciary duty and breach of contract, raising issues that concern the appropriate legal principles governing the merits of these claims as well as the damages awarded for each; they also argue that the trial judge's jury instructions on these claims were fatally flawed by omissions as well as erroneous statements of the law, errors that were compounded by use of a defective special verdict questionnaire. Finally, they challenge the judgment for Ehrlich on his G. L. c. 93A claim, arguing that it must be reversed because c. 93A is inapplicable in this case. We consider these issues separately, beginning with the breach of fiduciary duty claim.

Before doing so, however, it is important to review the apparent basis of the jury's findings on Ehrlich's breach of fiduciary duty and breach of contract claims. Ehrlich asserted both these claims against all three of the Selmark parties: Marathon, Selmark, and Elofson. The jury found only Selmark and Elofson liable for both breach of fiduciary duty and breach of contract. However, the jury were not asked to identify the specific basis or bases of their breach of fiduciary duty findings, or to specify which contract or contracts they found to have been breached.[25] Because only Ehrlich and Marathon (and not Selmark or Elofson) were parties to the employment agreement; and because Ehrlich, Selmark, and Elofson (but not Marathon) were parties to the conversion agreement, the reasonable explanation of the jury's findings is that they determined that (1) in terminating Ehrlich's employment with Marathon, Selmark, as majority shareholder in Marathon, and derivatively Elofson, as the sole owner of Selmark, committed a breach of the fiduciary duty they owed to Ehrlich, who was at the time of termination a minority shareholder of Marathon; and (2) Selmark and Elofson also committed a breach of the conversion agreement. At this juncture, the parties do not appear to seriously dispute this explanation.

---

[25]It would have been preferable for the trial judge to have asked the jury to specify the particular bases of their findings.

i. *Breach of fiduciary duty.* Ehrlich's employment agreement with Marathon, which expired by its terms at the end of 2002, was no longer in effect when he was terminated in 2007. By that time, the parties appear to agree that Ehrlich was an at-will employee and, accordingly, his employer was not bound by the termination for cause provisions of the employment agreement.

The jury found Selmark and Elofson to have committed a breach of their fiduciary duties to Ehrlich in relation to the termination of his employment by Marathon. We have long recognized that, as in a partnership, "the relationship among the stockholders [of a close corporation] must be one of trust, confidence and absolute loyalty if the enterprise is to succeed." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 587 (1975). This is particularly so given that the very structure of the close corporation may provide "an opportunity for the majority stockholders to oppress or disadvantage minority stockholders [through] a variety of oppressive devices, termed 'freeze-outs.' " *Pointer* v. *Castellani*, 455 Mass. 537, 550 (2009), quoting *Donahue, supra* at 588. Freeze-outs can occur when a minority shareholder is deprived of employment, *Pointer, supra*, citing *Donahue, supra* at 589, or, more generally, "when the reasonable expectations of a shareholder are frustrated." *Id.*, citing *Bodio* v. *Ellis*, 401 Mass. 1, 10 (1987).

Selmark and Elofson do not dispute these principles. Rather, they contend that fiduciary duties of good faith and loyalty are inapplicable where, as here, the parties have negotiated a series of agreements intended to govern the terms of their relationship. Relying on *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404 (1995), and its progeny, they argue that courts (and juries) may not consider claims for breach of fiduciary duty when the rights of the parties are determined by contracts that they have negotiated. See *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 278 (2007) ("When rights of stockholders arise under a contract . . . the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern"). Given the written agreements among the parties, the argument goes, as a matter of law Ehrlich cannot maintain his fiduciary duty claim, and the trial judge erred in denying Selmark's and Elofson's motion for judgment n.o.v. on this claim.

There are numerous strands to Selmark's and Elofson's argument regarding *Blank*'s application to the agreements; untangling them is a challenge. The essence of their contentions, however, appears to be that (1) Ehrlich's employment agreement may have expired on December 31, 2002, but it still governed the rights of the parties after that date and simply meant that following December 31, 2002, Marathon was permitted to terminate Ehrlich without cause; and (2) alternatively, regardless of whether the employment agreement still applied, Selmark's obligations to Ehrlich remained defined by the terms of the purchase agreement, conversion agreement, and stock agreement. We find both arguments unpersuasive.

In *Blank*, 420 Mass. at 404-408, we considered the rights of a plaintiff shareholder in a close corporation who was terminated, and his stock repurchased, pursuant to the terms of an employment agreement and stock agreement that expressly permitted him to be terminated without cause on six months' notice and required him thereafter to sell his stock back to the corporation. Addressing whether, notwithstanding the terms of the parties' employment and stock agreements, the plaintiff shareholder's termination was still governed by fiduciary duty principles, we concluded that "questions of good faith and loyalty with respect to rights on termination or stock purchase do not arise when all the stockholders in advance enter into agreements concerning termination of employment and for the purchase of stock." *Id.* at 408. We clarified subsequently that "[w]hen a director's contested action falls entirely within the scope of a contract between the director and the shareholders, it is not subject to question under fiduciary duty principles." *Chokel*, 449 Mass. at 278, citing *Blank, supra* at 408. Thus, when the challenged conduct at issue in a case is clearly contemplated by the terms of the parties' written agreements, we have declined to find liability for breach of fiduciary duty. See, e.g., *Merriam* v. *Demoulas Super Mkts., Inc.*, 464 Mass. 721, 727-728 (2013); *Chokel, supra* at 278. However, we have been equally clear that "the presence of a contract will not always supplant a shareholder's fiduciary duty." *Merriam, supra* at 727 n.14. When the contract does not entirely govern the other shareholders' or directors' actions challenged by the plaintiff, a claim for breach

of fiduciary duty may still lie. *Id.* at 727. See *Pointer*, 455 Mass. at 554; *King* v. *Driscoll*, 418 Mass. 576, 586 (1994), *S.C.*, 424 Mass. 1 (1996).

Given this framework, neither theory presented by Selmark places this case within the ambit of *Blank*. As to the employment agreement, Ehrlich contends, and we agree, that because there was no contract among the parties governing the terms of Ehrlich's employment with Marathon after 2002, *Blank* has no application. Selmark's argument that the employment agreement still had force in 2007, in the sense that the agreement's expiration provision implicitly allowed for Ehrlich's termination without cause after the agreement's end date of December 31, 2002, has no merit. Ehrlich was an employee at will after that date due to the fact that the employment agreement was no longer in effect, i.e., in the *absence* of the employment agreement, not *because* of it. Accordingly, Selmark and Elofson cannot rely on *Blank* to argue that the no longer operative employment agreement displaced fiduciary duties owed by Selmark (and derivatively Elofson) to Ehrlich as a fellow shareholder of Marathon.

Selmark's alternative contention, that even if the employment agreement had expired, *Blank* nonetheless applies because the parties' remaining three agreements were still in effect in 2007 and independently defined Selmark's and Elofson's obligations to Ehrlich, fails as well. Our cases are clear that the existence of a contract does not "completely relieve[]" shareholders of their fiduciary obligations, *King*, 418 Mass. at 586, and that a claim for breach of fiduciary duty may lie when the contract does not "entirely govern" the rights and duties of the parties. *Merriam*, 464 Mass. at 727 n.14. This case presents precisely such an instance. There are, it is true, brief references to the 2001 employment agreement between Ehrlich and Marathon in two of these other agreements,[26] and the third, the conversion

---

[26]Specifically, the purchase agreement notes, and incorporates by reference, Ehrlich's 2001 employment agreement with Marathon, and states that, other than that agreement and Terenzi's employment agreement, Marathon "has no employment contracts, consulting agreements, plans or contracts providing for [various types of compensation]." The stock agreement provides no additional employment rights, but references in ambiguous fashion a prior agreement that arguably is the employment agreement.

agreement, expressly gives Ehrlich a contractual right to be of-
fered an employment agreement with Selmark upon conversion
of his Marathon stock. But none of the three agreements contains
terms that address in any way Ehrlich's employment rights
upon expiration of his Marathon employment agreement and
before conversion of his Marathon stock. As *Blank* and like
cases make clear, to supplant the otherwise applicable fiduciary
duties of parties in a close corporation, the terms of a contract
must clearly and expressly indicate a departure from those
obligations. There was no such indication here.

Because *Blank* is inapplicable, and general fiduciary principles
apply, Selmark's argument that the breach of fiduciary duty
claim fails as a matter of law must itself fail, and the trial judge
did not err in denying Selmark's motion for judgment n.o.v.
"Our standard for reviewing a motion for judgment n.o.v. is
'whether, "anywhere in the evidence, from whatever source
derived, any combination of circumstances could be found from
which a reasonable inference could be drawn in favor of the
[other party]." ' " *Bank* v. *Thermo Elemental Inc.*, 451 Mass.
638, 651 (2008), quoting *Masingill* v. *EMC Corp.*, 449 Mass.
532, 543 (2007). See *O'Brien* v. *Pearson*, 449 Mass. 377, 383
(2007), quoting *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*,
413 Mass. 119, 121 (1992). Here, the record contains ample
evidence from which the jury could infer that, in terminating
Ehrlich, Elofson and Selmark violated the duty of utmost good
faith and loyalty owed to Ehrlich as a minority Marathon
shareholder. *Donahue*, 367 Mass. at 587. Ehrlich signed the
agreements and worked for six years at Marathon, giving up
Marathon profits to which he would have been entitled in order
to enable Marathon to make the necessary payments to Terenzi.
Soon after Ehrlich indicated that he intended to accelerate his
share of the payments to Terenzi, and just before achieving the
opportunity to convert his Marathon shares to Selmark stock,
Elofson terminated him without warning or reasonable explana-
tion. There was no evidence of poor performance — Ehrlich
was consistently the second highest producer of commission
revenue in the company — or of an inability to get along with
others. Further, given that the agreements by their terms did not
contemplate that Ehrlich would ever have an opportunity to

acquire control of Selmark, Elofson's proffered reason that he did not want Ehrlich to be a part of his succession plan for Selmark does not appear to serve as a legitimate business purpose for his termination. See *O'Brien*, 449 Mass. at 385. In any event, Ehrlich has demonstrated that Elofson could have sought less harmful alternatives before resorting to termination.[27] *Id.* See *Pointer*, 455 Mass. at 553-554 (shareholder in close corporation terminated pursuant to employment contract was still owed "real substance and communication, including efforts to resolve *supposed* complaints by less drastic measures than termination" [emphasis in original]).

*Damages.* Ehrlich was awarded $221,408 in damages for breach of fiduciary duty committed by Selmark and Elofson. On appeal, the Selmark parties purport to contest this award, but raise no specific challenge to the amount of the award or to how the jury arrived at it. Appellate briefs must "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Where, as here, an argument merely asserts error without sufficient legal argument, this standard is not met. *Kellogg* v. *Board of Registration in Med.*, 461 Mass. 1001, 1003 (2011). Accordingly, Selmark's argument concerning the $221,408 award for breach of fiduciary duty is waived. See, e.g., *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 194 (1990) (objection to reasonableness of attorney's fee awarded waived when argument in brief only addressed costs).

ii. *Breach of contract.* As discussed, the jury concluded that Selmark and Elofson committed a breach of the conversion agreement. The essence of these two parties' argument on appeal, as at trial, is that they could not have committed a breach because Ehrlich never acquired the necessary rights under that

---

[27]At trial, Elofson testified that he never warned Ehrlich about his concerns, hired a consultant, or took any other steps to resolve his issues with Ehrlich. Additionally, a business management consultant, testifying as an expert witness, opined that it was unusual for a minority shareholder to be terminated without prior feedback. For reasons we discuss *infra*, the issue whether Elofson was obliged to consider less harmful alternatives to deal with Ehrlich's alleged employment deficiencies than firing him was properly raised in this case.

agreement to make it operative — that is, Ehrlich was obligated to make all payments to Terenzi and acquire forty-nine per cent of the Marathon stock before conversion to Selmark stock was permitted, and he did neither.

Because the trial judge denied the Selmark parties' motion for judgment n.o.v. on this claim, we look to see whether there was any evidence to support at least a reasonable inference of a breach. See *O'Brien,* 449 Mass. at 383, quoting *Turnpike Motors, Inc.,* 413 Mass. at 121. Here, ample evidence was presented from which the jury could have found that Ehrlich acquired the stock required to permit conversion, and that Selmark's refusal to allow him to do so was a breach of the conversion agreement.

Section 5 of the purchase agreement delineates precisely the steps that Terenzi was required to take to declare Ehrlich in default, thereby triggering Selmark's right to cure.[28] Terenzi never met these requirements. In particular, the evidence showed that (1) the parties did not conduct the formal required semiannual review of Marathon's monthly cash flow; (2) Terenzi did not send the required shortfall notice specified in section 5(a); and (3) Terenzi also did not send the required default notice specified in section 5(c) of the purchase agreement. Although

---

[28]Section 5(a) of the purchase agreement states in relevant part:

"The parties hereto agree to review the monthly cash flow of [Marathon] for the purpose of determining if sufficient cash flow exists to service Note A and Note B, on a semi annual basis. Such review shall be conducted on March 1st and September 1st of each year. In the event [Marathon] has not made sufficient monthly payments to Terenzi in accordance with [the notes], Terenzi shall notify each of the Buyers in writing of the Monthly Shortfall for the previous six (6) month period in accordance with the notice provisions of Section 24 below (the 'Shortfall Notice'). . . ."

Section 5(c) of the purchase agreement requires that, if payment is not made within the allotted time frame after receipt of the shortfall notice, a default may be declared. On default, "Terenzi shall notify the defaulting Buyer, in writing, of such default (the 'Default Notice')."

Section 24 of the purchase agreement, setting out the provisions referenced in section 5(a), specifies:

"Any notices required hereunder shall be deemed effective if in writing, delivered in hand or two (2) business days after mailing postage prepaid by certified mail, return receipt requested, to the party entitled to notice at the addresses as follows. . . ."

Terenzi testified that he believed his e-mail notices were enough, in light of section 5's unambiguous mandate, the jury could have found that the e-mail messages were insufficient, that Ehrlich did not default under the terms of the contract, and that by ultimately making the required final payment — accepted by Terenzi — Ehrlich acquired the right to convert that Selmark then denied improperly. Selmark's motion for judgment n.o.v. on the breach of contract claim was properly denied.

*Damages.* We turn to the Selmark parties' challenge to the award of damages for breach of contract; the total award was for $1,537,163. The Selmark parties' basic claim is that the award lacks an adequate evidentiary foundation.

To provide context for this claim, it is useful to review the terms of the conversion agreement. The agreement provides that upon Ehrlich's acquiring forty-nine percent of the Marathon stock, he would be entitled to convert that interest into a twelve and one-half percent ownership interest in Selmark; in addition, Selmark would be required to offer Ehrlich an employment agreement — although no terms of employment are described in the conversion agreement itself. With these provisions in mind and considering as well the damages calculations presented at trial by expert witnesses, the jury's award could have been the sum of three figures, as follows. First, as the parties agree, the award likely includes some measure of lost income, representing the value of Ehrlich's lost opportunity for employment by Selmark;[29] the jury could have accepted the highest estimate of lost income, presented by Ehrlich's expert witness Howard Gordon, and awarded $819,649 in this category.[30] Second, given its size, the award may well include the value of the twelve and one-half per cent ownership interest in Selmark that Ehrlich would have acquired had he exercised his conversion rights. At

[29]The Selmark parties argue that any damages for loss of income cannot flow from a breach of the employment agreement between Marathon and Ehrlich, because the jury found Marathon not liable on the breach of contract claim. We agree, and limit our analysis of damages for lost income to Ehrlich's potential employment rights under the conversion agreement.

[30]At trial, each party presented expert testimony presenting their calculations of Ehrlich's lost income. Ehrlich's expert, Howard Gordon, estimated that the cumulative total of the present value of Ehrlich's lost income, for six years, was $819,649. Mark Preziosi, expert for the Selmark parties, calculated $258,000 in lost income for the same time period.

trial, both sides presented evidence calculating this value based on the terms of the stock agreement, implicitly assuming that, to obtain Ehrlich's stock, Selmark would have to exercise its call right and pay 110 per cent of the stock purchase value.[31] Accepting Gordon's estimate, the jury could have awarded $343,105 for Ehrlich's interest in Selmark.[32] Finally, the jury may have added to this total the $385,000 that Ehrlich paid (by giving up bonuses and profits otherwise due to him from Marathon) to acquire his twelve and one-half per cent interest in Selmark. Collectively, these figures approximate the total award for breach of contract.[33] However, there are two insuperable difficulties with this analysis: (1) it is essentially pure speculation — our own post-hoc rationale that neither the jury nor the parties have advanced or suggested; and (2) even if it were to represent a reasonably accurate summary of the award's basis, the award contains double recovery for the value of the Selmark stock.

The first difficulty just mentioned is self-explanatory; we focus on the second. The fundamental premise of "contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed." *Quinn Bros.* v. *Wecker*, 414 Mass. 815, 817 (1993), quoting *Laurin* v. *De-Carolis Constr. Co.*, 372 Mass. 688, 691 (1977). Accordingly, Ehrlich's contract damages should not exceed the value of the benefit of which he was deprived. See generally *Salvas* v. *Wal-Mart Stores, Inc.*, 452 Mass. 337, 374 (2008). Here, if we have discerned correctly the basis of the jury's award, the total includes individual components that are reasonable when considered separately but, when combined, are contrary to the language of the agreements and impermissibly duplicative, giving Ehrlich more than the benefit of his bargain. See generally *id.* In particular, there is at least one fundamental flaw in the jury's

---

[31]The "Stock Purchase Value" is defined in the stock agreement as "twelve and one half percent . . . of the average annual gross commission revenue of [Marathon] for the previous thirty-six (36) months, plus forty-nine percent (49%) of the Working Capital . . . of Marathon . . . as of the Conversion Date . . . ."

[32]Gordon valued Ehrlich's interest in Selmark at $343,105, and Preziosi valued it at $193,579.

[33]They total $1,547,754, exceeding the jury award by $10,592.

reasoning. If indeed the jury did award Ehrlich damages to compensate him for the $385,000 he paid for his interest in Marathon, and also awarded $343,105 for the value of the Selmark stock he would have received on conversion, the award includes a double recovery for this single component. See *Blake* v. *Commissioner of Correction*, 403 Mass. 764, 767 (1989) (double recovery for same injury or loss is impermissible). On the other hand, if the jury did not award damages to reflect the $385,000 that Ehrlich in effect paid for his Marathon stock, this would leave a significant portion of the award unexplained, resulting in a disproportionate recovery. See *Commonwealth* v. *Johnson Insulation*, 425 Mass. 650, 668 (1997), citing *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 787 (1975) (appellate court may find abuse of discretion in trial judge's refusal to grant new trial if damages awarded are "greatly disproportionate to the injury proved or represent a miscarriage of justice").[34]

In sum, we conclude that the jury's award of damages for breach of contract must be reversed and the case remanded for a new trial on these damages. To assist consideration of the damages issue on remand, we briefly address the Selmark parties' remaining arguments.[35]

---

[34]Additionally, the Selmark parties argue that the conversion agreement cannot reasonably be interpreted in a way that would guarantee Ehrlich future employment after he sold his Selmark stock back to the company at the premium price. We interpret this argument to mean that the jury theoretically could have awarded damages for either Ehrlich's lost income, or his interest in Selmark based on the premium "call option purchase value," but not both. Given our conclusion that the award of damages cannot stand, we do not reach this issue. But by not reaching it, we do not mean to suggest that Ehrlich is precluded from recovering damages for both lost income and the value of his stock should the jury find that both are necessary to equal the value of the benefit of which he was deprived. For example, assuming for argument that Ehrlich would not be entitled to receive the *premium* price for the stock simultaneously with recovery for lost income, he might still recover for lost income and the value of the stock calculated according to the agreement's stock purchase value formula, without premium.

[35]One of Selmark's arguments concerns the actual calculation of the stock purchase value under the formula spelled out in the stock agreement. Although the basis for the parties' respective calculations was vigorously disputed at trial, no substantive legal argument has been raised on appeal. Accordingly, we deem this issue waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); *Kellogg* v. *Board of Registration in Med.*, 461 Mass. 1001, 1003 (2011).

Selmark argues that because the conversion agreement only entitled Ehrlich to an offer of employment without specifying any terms, Gordon's calculation of lost income based on six years of future income was "legally untenable." We disagree. "While damages may not be determined by mere speculation or guess" (citation omitted), *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 608 (1961), "that there may be an element of uncertainty as to the amount of damages does not bar their recovery." *Stuart* v. *Brookline*, 412 Mass. 251, 256-257 (1992), citing *Agoos Leather Cos., supra.* Cf. *Boothbay* v. *Texon, Inc.*, 414 Mass. 468, 475 (1993) (jury award of damages to terminated employee for future compensation appropriate where employee had oral employment contract for indefinite term and presented evidence of "his salary, his salary history, his reviews and promotion expectations, his bonuses and his pension rights at the time of the breach"). Expectation damages for breach of contract includes consequential damages, i.e., "those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties." *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 762 (1993) (quotation omitted). Here, there was sufficient evidence to support a determination by the jury that Ehrlich was entitled to an award of consequential damages that included six years of lost income. The jury could have found, based on Ehrlich's long-term financial and employment commitment to Marathon and Selmark, that had he not been terminated, he would have remained employed by Selmark for at least several years after conversion, and six is within a range of reasonable projection.[36] The jury also had ample calculations, provided by two expert witnesses, that detailed estimates of Ehrlich's future lost earnings, and properly reduced them by his

---

[36]In the context of unlawful termination in employment discrimination cases, this court has authorized consequential damages in the form of lost future earnings and benefits — "front pay" — that have been "proved with reasonable certainty as attributable to the employer's misconduct." *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 386, 390 (1988). In that context, applying a number of evaluative factors, Massachusetts courts have upheld liberal front pay awards. See, e.g., *Haddad* v. *Wal-Mart Stores, Inc. (No. 1)*, 455 Mass. 91, 102 (2009); *Ventresco* v. *Liberty Mut. Ins. Co.*, 55 Mass. App. Ct. 201, 210 (2002); *Handrahan* v. *Red Roof Inns, Inc.*, 48 Mass. App. Ct. 901, 902 (1999).

current income at Tiger. The contention that the jury award was too speculative and unsupported by the terms of the conversion agreement fails.

Finally, we address the Selmark parties' argument that "Gordon's calculations of future wages were predicated upon legally untenable assumptions that Ehrlich would receive a compensation package providing him with 27.3% of the funds available for distribution to the owners." They claim that these assumptions contradict paragraph 4 in the conversion agreement insofar as the paragraph specified that Ehrlich's offer of an employment agreement from Selmark was to "provide[] for compensation, bonuses, expense payments, and benefits *consistent with his percentage ownership in [Selmark]*" (emphasis added); their view is that this paragraph limits Ehrlich's total compensation to no more than twelve and one-half per cent of the funds available for distribution. As a general proposition, there seems to be no inherent relationship between the percentage of a person's stock or ownership interest in a corporation and the terms of his employment by that corporation, such that an expert's opinion concerning loss of future income related solely to the employment must take stock ownership into account. The question then is whether, and if so, how, this language in paragraph 4 of the conversion agreement alters the general proposition in this case such that it undermines the basis of Gordon's expert opinion testimony on Ehrlich's loss of future income. We are not able to answer the question on the present record. While Gordon does not appear to have referenced the quoted language in paragraph 4 in his trial testimony, we cannot say whether he considered it. More to the point, the meaning of the quoted language is not self-evident, and no evidence was offered concerning the intent of the parties in including this language in the conversion agreement. On remand, it will be open to both the Selmark parties and Ehrlich to explore these questions.

iii. *Jury instructions.* The Selmark parties raise three arguments concerning the trial judge's jury instructions and special verdict questionnaire. They claim that the judge's failure to inform the jury that fiduciary duties can be displaced by contract under *Blank*, 420 Mass. at 404, and its progeny was reversible error, and specifically take issue with the exclusion of their

proposed instruction that the jury "may not consider whether or not the [the Selmark parties] acted in good faith when [Marathon] terminated the defendant's employment"; and the inclusion of the instruction that, when considering whether the Selmark parties had a legitimate purpose for their actions, the jury should consider whether the purpose could be achieved through a "less harmful" course of action.[37]

With respect to the argument that an instruction on *Blank* was improperly excluded, there was no reversible error. "A judge should instruct the jury fairly, clearly, adequately, and correctly concerning principles that ought to guide and control their action." *Mahoney* v. *Gooch*, 246 Mass. 567, 571 (1923). An appellate court considers the adequacy of the instructions as a whole, not by fragments. See *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 507 (2001); *Comey* v. *Hill*, 387 Mass. 11, 17 (1982). Here, the instructions adequately and correctly covered the applicable legal principles for breach of contract and breach of fiduciary duty, albeit with a broad brush. *Mahoney, supra.* The judge might have included an instruction that referenced generally the principles discussed in *Blank*, but "[e]very possible correct statement of law need not . . . be included in jury instructions if the instructions as given are correct and touch on the fundamental elements of the claim." *Conners* v. *Northeast Hosp. Corp.*, 439 Mass. 469, 481 (2003), quoting *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 503 (1997). Moreover, it bears remembering that in this case, the Selmark parties consistently have taken the position that, by 2007, the employment agreement had expired and Ehrlich was an employee at will. Although Selmark contends that even though the employ-

---

[37]Ehrlich contends that the Selmark parties failed to preserve their objections to the judge's jury charge based on *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404 (1995). The argument is meritless. Our rules require that, to claim error in the jury charge on appeal, an objection must first be made before the trial court judge. See Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974). This puts the judge on notice of the issue. *Rotkiewicz* v. *Sadowsky*, 431 Mass. 748, 751 (2000). While the rule may be satisfied in various ways, at a minimum, the "party objecting to the inclusion or exclusion of an instruction must . . . clearly bring the objection and the grounds for it to the attention of the judge." *Id.* The record makes clear that the Selmark parties did so here, both in the charge conference and at trial. The objections were properly preserved.

ment agreement had expired, *Blank* still applies, as previously discussed, we disagree and have concluded that *Blank* has no real bearing on this case. Accordingly, the absence of an instruction explaining the *Blank* principles did not prejudice the *Selmark* parties.[38]

The Selmark parties' second claim is that six "legal questions" at the "core of the case were not ruled on as matters of law, but were submitted to the jury for resolution — and submitted without instruction on the law they were to apply." The claim fails: the jury were not forced to decide legal questions without guidance from the trial judge. Of the six "legal questions" the Selmark parties mention, four raised factual rather than legal issues, and as such were appropriate for the jury to decide,[39] and the remaining two are merely restatements of legal issues considered and ruled on by the trial judge, who instructed the jury according to those rulings.[40]

Finally, we address the argument that the special verdict questions the jury were asked to answer "conflat[ed] different theories of recovery," leading to jury confusion and warranting a new trial. The Selmark parties objected to the judge's removal of checkboxes on the special verdict questionnaire that would have specified which type of breach of contract — breach of written contract, breach of implied-in-fact contract, or breach of contract by estoppel — the jury relied on in deciding the breach of contract claim. As a result, they claim, it is now unclear

---

[38]As for the instruction on a "less harmful" course of action, its inclusion in the jury charge was proper regardless of whether an instruction on *Blank* was given. As discussed above, the jury were appropriately instructed on the applicable legal principles governing breach of fiduciary duty, and our law is clear that these principles include consideration whether the Selmark parties had a legitimate business purpose for termination and sought a "less harmful" course of action before doing so. *O'Brien* v. *Pearson*, 449 Mass. 377, 385 (2007). Accordingly, the judge did not err by including the instruction.

[39]The four factual determinations for the jury concerned: (1) the applicability of the employment agreement after 2002; (2) whether to accept Gordon's use of six years as the period over which to calculate lost income; (3) whether Ehrlich was entitled to damages for breach of the conversion agreement; and (4) whether Ehrlich acquired the necessary Marathon shares in order to exercise his conversion rights.

[40]The legal issues considered and implicitly ruled on were (1) whether *Blank* principles applied; and (2) whether Elofson had a fiduciary duty to consider "less harmful" alternatives before terminating Ehrlich.

whether the jury found breach of a written or "some completely different" agreement or agreements, and "effective appellate review of the jury's handling of *Blank* issues [is] impossible."

The Selmark parties are attempting to create ambiguity where none exists. As discussed, the evidence supports the conclusion that the jury found a breach of the written conversion agreement, and the parties do not dispute this. Ehrlich's counsel has acknowledged that there was "no real implied contract argument made." Furthermore, the "nature, scope, and form of special questions submitted to a jury pursuant to Mass. R. Civ. P. 49 (a)[, 365 Mass. 812 (1974),] . . . are matters within the discretion of the trial judge." *Draghetti* v. *Chmielewski*, 416 Mass. 808, 818 (1994), quoting *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 802 (1987). Our review of those questions is considered "in light of the instructions given by the judge." *Draghetti*, *supra*. It clearly would have been appropriate and indeed preferable for the judge to have asked the jury to identify the particular contract they found to have been breached. But given that the jury were properly instructed on all three theories of contract recovery, we cannot conclude that the special questions created juror confusion.

iv. *Chapter 93A.* The jury found that all three Selmark parties engaged in unfair or deceptive acts or practices in violation of G. L. c. 93A.[41] The trial judge entered judgment and awarded double damages, attorney's fees, and costs. On appeal, the Selmark parties argue that c. 93A is inapplicable here because all the claims raised stem from or concern a single venture of which Ehrlich, Elofson, Marathon, and Selmark were part. We agree.

"It is well established that disputes between parties in the same venture do not fall within the scope of G. L. c. 93A, § 11." *Szalla* v. *Locke*, 421 Mass. 448, 451 (1995). To bring a claim under the statute, there must be "a dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.' "

---

[41]Ehrlich asserts a violation of G. L. c. 93A, § 2, which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G. L. c. 93A, § 11, provides his cause of action.

*Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 563 (2008). "Inter-enterprise" disputes, including those stemming from an employment relationship or between or among fellow shareholders, are essentially private in nature, and thus not considered "commercial transactions" within the meaning of c. 93A. *Id.*, quoting *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 23 n.33, cert. denied, 522 U.S. 1015 (1997). See *Psy-Ed Corp.* v. *Klein*, 459 Mass. 697, 719 (2011) (c. 93A inapplicable to disputes arising from employer-employee relationship or occurring within same company); *Zimmerman* v. *Bogoff*, 402 Mass. 650, 662-663 (1988) (c. 93A inapplicable to dispute between shareholders in close corporation; parties may seek relief in suit for breach of fiduciary duty).

Here, the evidence shows that the parties' disputes all arose out of their connections to and interests in Marathon: Ehrlich's counterclaims were based on the consequences of the alleged wrongful termination of his employment with Marathon by his fellow Marathon shareholder, Selmark, and Selmark's then sole shareholder, Elofson, and the breach of a stock conversion agreement relating to Marathon stock; the central theme of his claims was that the Selmark parties were acting in violation of the fiduciary duties they owed Ehrlich as a minority shareholder of Marathon. Because c. 93A does not apply to employment and shareholder relationships, it has no application here.

Ehrlich's arguments do not persuade us otherwise. He first contends that, because Selmark and Marathon believe they are separate entities,[42] the dispute between Ehrlich and Selmark was not "intra-organizational" and, therefore, c. 93A applies. This argument lacks merit. At all relevant times, Ehrlich and Selmark were both shareholders of Marathon. Furthermore, regardless of whether Ehrlich was employed by Marathon, he was supervised and terminated by Elofson, the majority owner of both Selmark and Marathon. The "intra-organizational" connection among the parties is undeniable. Alternatively, Ehrlich argues that even if some of his claims fall outside of the scope of c. 93A, he can still recover for conduct occurring before the agreements were

---

[42]Notably, Ehrlich himself argued vigorously at trial, and on appeal, that, after the agreements were signed, Marathon and Selmark were essentially the same entity.

signed, and after he was terminated from Marathon. He cannot. As to conduct prior to the agreements, Ehrlich cites to no trial or other evidence supporting his assertion that "it was never Elofson's intention *at the time these negotiations took place* to provide Ehrlich with Selmark's stock" (emphasis added). He merely argues that, during negotiations over the agreements, Elofson initially wanted them to allow for Ehrlich's termination as an employee without cause; this precontract desire on Elofson's part — a desire that was not ultimately reflected in the actual terms of the executed agreements — cannot carry the weighty significance Ehrlich tries to give it. See *Szalla* v. *Locke*, 421 Mass. at 452 (in context of c. 93A, plaintiff's argument that misrepresentations were at "arm's length" because they took place before parties' association was finalized was "unavailing because the prior events occurred in the course of [the parties'] developing their mutual association which culminated in an agreement and exchange of property and services"). As to conduct after Ehrlich was terminated from his Marathon employment, Ehrlich fails to acknowledge that, although the parties' employment relationship had ended, their conduct in relation to each other was still governed by the fiduciary obligations that they owed as joint shareholders of Marathon, which places the conduct outside the scope of c. 93A.

The judgment in favor of Ehrlich on his claim under c. 93A must be reversed.[43]

b. *Ehrlich's cross-appeal.* i. *Breach of fiduciary duty.* At trial, Marathon and Selmark argued that Ehrlich violated his fiduciary duties of good faith and loyalty to Marathon when he solicited Marathon's principals for Tiger. The jury agreed, and awarded $240,000 in damages.[44] On appeal, Ehrlich contends that, because he was fired by Elofson and essentially "frozen out" of

---

[43]The jury awarded Ehrlich $221,408 for his G. L. c. 93A claim. The Selmark parties argue that, because Ehrlich received the same amount for his breach of fiduciary duty claim, the c. 93A damages are impermissibly duplicative and cannot stand. Because we have concluded that Ehrlich is not entitled to prevail on his G. L. c. 93A claim, we do not reach this issue.

[44]Ehrlich claims that the trial court found he could be liable for "accepting employment in competition with Marathon." However, because Marathon never pursued its initial claim against Ehrlich for accepting employment in violation of the noncompete provision of the employment agreement, the only issue that the jury were asked to decide was whether Ehrlich violated his

Marathon, he had the right to compete with Marathon without committing a breach of his fiduciary duties to the company. Therefore, he argues, the trial judge erred in refusing to instruct the jury on Ehrlich's right to compete and in denying his motion for judgment n.o.v. We disagree and, finding no error, affirm the judgment in favor of Marathon and Selmark on this claim.

Our cases are clear that shareholders in close corporations owe fiduciary duties not only to one another, but to the corporation as well. See, e.g., *Chambers* v. *Gold Medal Bakery, Inc.*, 464 Mass. 383, 394 (2013); *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. at 593. At issue here is whether those fiduciary duties to the corporation continue once a shareholder has been "frozen out," or wrongfully terminated, by that corporation.

Relying on a decision of the Supreme Court of Wyoming, Ehrlich urges us to find, as a matter of law, that his termination from Marathon extinguished his fiduciary duties as a shareholder, allowing him to compete with the company. See *J Bar H, Inc.* v. *Johnson*, 822 P.2d 849, 861 (Wyo. 1991) (holding that "where a shareholder/director/employee of a close corporation has been wrongfully terminated from employment with the corporation and has been unjustly prevented from fulfilling her function as a director or officer, she can no longer be considered to act in a fiduciary capacity for the corporation" and, thus, is under no obligation not to compete).[45] We decline to follow the decision in *J Bar H*. Rather, we agree with the Selmark parties that *J Bar H* does not achieve the "optimal result." See *Rexford Rand Corp.* v. *Ancel*, 58 F.3d 1215, 1220 (7th Cir. 1995). Allowing a party who has suffered harm within a close corporation to seek retribution by disregarding its own duties has no basis in our laws and would undermine fundamental and long-

fiduciary duties by soliciting Marathon's principals for Tiger. Therefore, our consideration on appeal is limited to whether Ehrlich was entitled to compete with Marathon, not whether he could have accepted employment with Tiger in the first place.

[45]Ehrlich also cites two additional cases from other jurisdictions that we find to be factually distinguishable. See *Rexford Rand Corp.* v. *Ancel*, 58 F.3d 1215, 1220 (7th Cir. 1995); *Voss Eng'g, Inc.* v. *Voss Indus., Inc.*, 481 N.E.2d 63 (Ill. App. 1985).

standing fiduciary principles that are essential to corporate governance. See *Donahue*, 367 Mass. at 587. We see no reason to take such a drastic step. "If shareholders take it upon themselves to retaliate any time they believe they have been frozen out, disputes in close corporations will only increase. Rather, if unable to resolve matters amicably, aggrieved parties should take their claims to court and seek judicial resolution." *Rexford Rand Corp.*, *supra* at 1221. The judgment in favor of Marathon and Selmark should be affirmed.

ii. *Jury award for breach of contract.* Ehrlich contends that the trial judge erred in failing to award multiple damages on his breach of contract claim. The crux of his argument is that, because the judge awarded double damages on his claim under c. 93A for unfair or deceptive practices, he is similarly entitled to multiple damages for breach of contract because they arise out of the "same transaction and occurrence" as his c. 93A claim. G. L. c. 93A, § 11 ("For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence"). The argument appears to stand c. 93A on its head, but in any event, given our conclusion that Ehrlich is not entitled to recover on his c. 93A claim, he no longer has a foundation upon which to rest his argument for multiple contract damages.

iii. *Injunctive relief.* Finally, Ehrlich argues that the trial court erred in dealining to expand the scope of posttrial injunctive relief to freeze Elofson's assets and allow Ehrlich to periodically monitor those assets. The requested relief is necessary, he claims, to protect his awards of damages and assure that assets are available to satisfy the judgment. Despite Ehrlich's desires, "it was a matter of discretion [for the trial judge] to refuse to grant an injunction." *Zottu* v. *Electronic Heating Corp.*, 334 Mass. 442, 445 (1956). Here, we see no indication that the trial judge abused his discretion, particularly in light of the fact that he granted Ehrlich's motion for injunctive relief to freeze Selmark's and Marathon's corporate assets. Furthermore, given our determination that the largest award Ehrlich received must be reversed and remanded for a new trial, the question whether the trial judge should have provided additional posttrial relief to Ehrlich may be moot at this point.

3. *Conclusion.* The judgment of the Superior Court is vacated, and the case remanded for further proceedings consistent with this opinion.

*So ordered.*