Kaplan, Mitchell H., J.
INTRODUCTION
This case arises out of a dispute between the members of Applied Tissue Technologies, LLC (ATT), a limited liability company originally organized under the laws of Massachusetts, but later merged with and into a Delaware limited liability company of the same name (ATT Delaware).
The case was tried to the court on April 4, through April 7, 2016. Six witnesses testified and 140 exhibits were received in evidence. Notwithstanding this substantial evidentiary record, the court finds that very few material facts are in dispute. Rather, the very difficult questions raised by this case involve the legal consequences of the parties’ conduct and the equitable relief that the court may appropriately enter.
FINDINGS OF FACT
The plaintiff, W. Robert Allison, is a graduate of Harvard College and Stanford University Law School. He practiced law in Boston for approximately 30 years, specializing in business and real estate matters. In 1997, he left the practice of law to become president of a software company, but lost that position two years later when the company was sold. In 1999, Allison was looking for another business opportunity, as he did not wish to return to the practice of law.
The defendant, Elof Eriksson, M.D., Ph.D., was, until recently, Chief of the Division of Plastic Surgeiy at Brigham and Women’s Hospital (BWH). He trained both in Sweden, where he was born, and in the United States, joining the BWH staff in 1986. He is listed as the inventor on several patents, including of relevance to this case, patents relating to the treatment of wounds.
Allison and Eriksson first met in 1995, when Eriksson was referred to Allison as an attorney who could represent him in connection with a business opportunity. They met briefly, but Eriksson decided not to *648 pursue the opportunity, and Allison never sent Eriksson an engagement letter or a bill for his time.
Allison and Eriksson next encountered one another in 1999. Eriksson wanted to found a business based on intellectual property (IP) having to do with the treatment of wounds that he patented while at BWH and had purchased from BWH for approximately $150,000. He contacted Allison who explained that he was no longer practicing law, but was himself looking for a business opportunity. After discussions, the two agreed that they would form ATT together. Allison contributed $15,000 and Eriksson $45,000 and the IP; in 2002 ATT reimbursed Eriksson the sum he had paid to BHW for the IP. Eriksson received 75% of the membership interests (or points) in ATT and Allison 25%.
Allison formed ATT by filing its Certificate of Organization with the Massachusetts Secretary of State on January 28, 2000. He also prepared ATT’s operating agreement which was signed by him and Eriksson on that same date. Allison used a very simple form of operating agreement as the template, which he obtained from the internet.
The parties dispute whether Allison was acting as Eriksson’s attorney in connection with the formation of ATT. The court finds that he was not. The court finds that Allison had decided before he and Eriksson first discussed ATT that he would no longer practice law. Eriksson may not have fully appreciated the distinction between managing the legal affairs of the LLC and acting as lawyer either for ATT or Eriksson or both; however, the court finds that no attorney/client relationship was established between Allison and Eriksson. In any event, Allison and Eriksson showed the operating agreement to attorney Sam Mawn-Mahlau, then with the firm of Edwards & Angelí LLP, who found it acceptable for a company just starting-up. Mawn-Mahlau was an attorney with whom Eriksson had worked while at BVJH. Mawn-Mahlau went on to provide legal services for ATT through 2011. The court also notes that no material disputed issue of law or fact turns on the question of whether Allison was representing Eriksson.
Of relevance to this action, the original operating agreement contained the following provisions. Eriksson and Allison were the only two members of ATT, and the company was to be managed by its members who voted based on their respective membership interests; there were no provisions either for managers nor a super majority vote for particular matters. However, additional capital contributions required the unanimous consent of all members. Eriksson argues that this provision was unfair to him. The court finds that such a provision is not uncommon in a joint venture involving two participants who agree that they must both consent to certain, fundamental business changes, even though they do not have equal interests in the profit and loss of the enterprise.
Allsion became the president and chief executive officer of ATT, and was responsible for managing the business. ATT rented office space in Newton, where Allison worked. The parties agreed that Allison would receive compensation of $225,000 a year to run the day-to-day affairs of the company and Eriksson $100,000 a year as a consulting fee.[1]
In September 2000, ATT entered into an agreement to license certain of ATT’s IP with a third-party which generated $3.9 million in licensing and royalty revenues before it ended in 2005. During this time, substantial work was done on new technology and new patent applications were filed. The law firm Quarles and Brady represented ATT in connection with intellectual property matters. The parties began to take their salaries sometime in 2001. Additionally, during these years substantial distributions of cash were also made to each.[2] At some point, ATT hired a full-time employee, Christian Baker. Baker had worked for Eriksson at BWH as an operating room technician. In 2004, he was added as a member of ATT, receiving a 2% of the points from Allison and Eriksson, who each transferred interests to Baker according to their 25%/75% split.
In late 2003, Allison and Eriksson decided to distribute some of their points in ATT to trusts established for the benefit of family members as an estate planning device. Mawn-Mahlau and one of his partners provided the legal work for this task. Allison and his son were the trustees of a Trust for the benefit of Allison’s family (the Allison Trust) and Gudrun Eriksson (Eriksson’s wife) and Dr. Karl Proppe, a physician and close friend of Eriksson, were the trustees of the Trust for the benefit of Eriksson’s family (the Eriksson Trust).
In connection with the transfer of these points to the Trusts, Mawn-Mahlau prepared a more lengthy and sophisticated “First Amended and Restated Operating Agreement” (the Operating Agreement) which the parties executed at the time the Trusts were admitted as members. Eriksson paid little attention to the preparation of the Operating Agreement, which he understood generally to cany-forward the arrangements agreed to in the original operating agreement. The Operating Agreement created the position of Manager who was to be elected by the Voting Members and provide the day-to-day management of ATTs affairs; Allison became the Manager. It also defined the term “Original Members” to be Eriksson and Allison. The Original Members had to agree to the addition of any new members of ATT, who could be either voting or non-voting. Notably, any change to the Operating Agreement also required the consent of the Original Members, and no change in the Operating Agreement that had the effect of reducing any member’s interest in ATT or interest in distributions from a sale of its assets or cash flow could be made without the consent of the affected member. This provision therefore served *649 to prevent the dilution of any member’s interest in ATT, without that member’s consent. This created somewhat more protection for minority members than had previously existed; however, with respect to Allison, it generally carried forward the provision in the original operating agreement that both he and Eriksson had to agree to any further capital contributions. The Operating Agreement set the membership vote required for most significant business decisions at 60%, but as Eriksson and his family Trust continued to hold 75% of the points, this was not a significant change.
By September 2005, ATT was no longer generating revenues and Allison and Eriksson agreed that ATT would stop paying their salaries. The parties are in sharp dispute as to whether they agreed that deferred salaries would accrue, to be paid at a later date when ATT was financially able to pay them, or simply discontinued, to be resumed at some time in the future. Their testimony is consistent that the decision was reached in a brief conversation and was not documented in any writing. The court finds that Eriksson and Allison may have different views as to exactly what was agreed upon, but also finds that there was no meeting of the minds that salaries would be deferred to some indefinite date in the future. There is no evidence that the topic was discussed again until late 2011. Further, ATT’s financial records, maintained by Allison, never reflected deferred salaries as either a contingent or fixed liability.
ATT continued to generate very little revenue. In 2007, it could no longer afford to pay Baker, and he was terminated. A dispute arose between Allison and Eriksson concerning the terms of Baker’s departure. While the parties disagree concerning the facts underlying Baker’s termination, they are not material to the outcome of this case. It is sufficient to state that Allison and Eriksson resolved their dispute concerning Baker’s termination by Allison’s transfer of 2% of his points to Eriksson. After that transfer, ATT’s points were held by its members in these percentages: Eriksson-55.5%; Eriksson Trust-20%; Allison-14.66%; Allison Trust-7.84%; and Baker-2%.
During the period, 2006 to 2008, Eriksson lent ATT $200,000 to cover operating expenses, which was later repaid to him with interest accrued at 15%. In or around this period, Allison looked for work outside of ATT, which, as noted above, was not paying him, but found only a few weeks of work in a temporary placement. He did not seek work as a lawyer. The parties are in dispute concerning how many hours a week Allison worked on ATT’s affairs between 2005 and 2011. There is insufficient evidence in the record from which the court can make any finding on this. It appears likely that during some weeks Allison devoted substantial time to ATT, and on other occasions it did not require very much of his attention.
In December 2008, ATT entered into an asset purchase agreement with Wright Medical Technology, Inc. (Wright) pursuant to which ATT sold to Wright its interests in a wound care technology that the parties refer to as the XPansion product or kits. The purchase price was effectively $1,000,000, plus additional royalties to be paid ATT as Wright sold XPansion kits. Unfortunately, Wright did not sell very many kits and the royally stream from this product was meager.
In March 2010, Dr. Karl Proppe became the Chief Executive Officer of ATT. Allison relinquished that position, but continued on as President and Manager of ATT. How the duties of each would differ is not clear, but Proppe was intended to lead ATT in the development of a negative pressure wound treatment technology. Proppe did not make a financial contribution to ATT and did not receive any points. Allison continued to be responsible for the general management of ATT’s business.
In May 2011, Wright notified ATT that it was exiting the wound care business and would no longer be selling XPansion kits. Thereafter, Allison led negotiations with Wright for the reacquisition of Xpansion; he received legal assistance from Mawn-Mahlau. The repurchase agreement was finalized in September 2011. Under its terms, ATT was to pay Wright a 6% royally on sales, capped at $1,000,000, and to purchase the 4,445 XPansion kits that were then in Wright’s inventory at a price of j ust over $ 100 each over the next year, a $450,000 obligation. Allison attempted to find third-pariy sales representatives to market XPansion, but was unsuccessful. A decision was reached that ATT would hire an experienced sales person to market XPansion.
During the summer and fall of 2011, Allison prepared revenue and expense projections for ATT, but became frustrated by Eriksson’s failure to discuss and comment upon them. The projections, however, were not based on any market research concerning the likely sales of XPansion, but rather simply identified the revenue that would be generated if certain numbers of kits were sold at various prices.
On November 15, 2011, Allison sent a letter to Eriksson and Proppe stating that he was resigning as Manager and President of ATT. He was willing to provide services to ATT on a part-time basis for a fee of $50 an hour. On December 19, 2011, Allison, Eriksson, and Proppe met at what they described as a “members meeting.” Among many other matters that were discussed, Allison asserted that ATT owed him his deferred salary at the rate of $100,000 annually since November 2005. Eriksson responded that they had not agreed to defer compensation but rather to discontinue salary, until ATT could afford to start paying it again, and Allison had not worked at ATT full-time since 2005. Everyone understood that the company needed to raise capital, but disagreed on how to accomplish that. Allison agreed that he would provide some services to ATTwithout demanding compensation, and assist in transitioning work to Eriksson’s *650 wife who would assist with bookkeeping and a new marketing director.
Neil Webber was hired as vice president of sales and marketing in December 2011, to begin in January 2012; he was initially to focus on selling the Xpansion kits. His annual salary was $200,000. He was not successful in selling the product.
The ATT members met again on January 25, 2012. The question of whether Allison was owed deferred compensation was discussed, but the parties were unable to resolve their dispute. The need for additional capital was the principal topic of discussion, as ATT was nearly out of cash. Eriksson stated that he was no longer willing to loan money to the company as he had in the past, but was willing to make a further investment for additional equity. Allison responded that he was unwilling to have his interest diluted, unless the investment came from an outside investor. No one was aware of any potential outside investor, and generally agreed that ATT was at least a year away from being able to attract any outside investors. Eriksson asserted that the Operating Agreement needed to be amended, presumably so that he could invest equity over Allison’s objection, but was non-specific concerning what the amendments should be.
These issues continued to be discussed and the subject of email exchanges over the next two months. Allison’s position was firm that he would not (and could not afford to) invest in the company and would not agree to have his interest diluted by a further equity investment from Eriksson. At one point, Eriksson specifically offered to invest $600,000, if Allison would invest $200,000, but Allison rejected this proposal. He also would not agree to use personal assets to secure a bank loan to ATT. Eriksson was frustrated by Allison’s, position that he’ would no longer serve as the President and Manager of ATT, was unwilling to commit personal assets to the firm, and insisted that his ownership interest not be diluted (except by an outside investor that no one believed would materialize). At one point, Eriksson suggested that ATT would have to be dissolved.
Eriksson’s daughter, Emma Eriksson Broomhead, was then an associate at the Waltham office of the law firm, Gunderson Dettmer, LLP. Broomhead arranged a meeting for her father with a senior attorney at Gunderson, Gary Schall. The three met on February 9, 2012. Eriksson explained his concerns regarding ATT. Various approaches were considered, including Eriksson buying out Allison or a purchase of all the assets of ATT by another company. Itwas decided that an appraisal of ATT was necessary. Schall and Gunderson were retained to represent ATT; Proppe signed the engagement letters.[3] No one told Allison that Schall had been retained; Schall also did not contact Mawn-Mahlau, who had been outside counsel to ATT for over ten years. The court finds that Eriksson, Proppe and Schall all specifically chose not to let Allison know of Schall’s engagement.
At Schall’s recommendation, ATT engaged Orchard Partners, Inc. to do the appraisal. Eriksson told Allison about the appraisal, but not about Schall’s involvement or the actual purpose for it. Orchard Partners did not meet with Allison in connection with the engagement. The appraisal was issued on April 16, 2012. It was curiously principally based on a discounted cash flow valuation, although ATT had not generated any significant income in the last few years, and its only significant assets was its IP. Orchard Partners apparently did not consult with anyone who could value the IP. Orchard Partners concluded that 100% of the equity of ATT had a value of $239,000, but only if $620,000 of “funding” was provided to ATT. According to Orchard Partners, in the absence of that funding, ATT’s value was $0. Or stated differently, someone would have to commit $620,000 to ATT and then the company would be worth $239,000.
In April 2016, Eriksson lent $26,000 to ATT, as it was out of cash and unable to pay its bills, including Webber’s salaiy.
In May 2012, Schall and Eriksson began to focus on two approaches to deal with Allison. Eriksson would make an offer to purchase Alison’s and the Allison Trust’s interests in ATT based on the Orchard Partners appraisal. If he refused the offer, Eriksson would form ATT Delaware, which would have a new operating agreement that would accomplish Eriksson’s goals. Eriksson would then vote his points in ATT to cause ATT to merge with and into ATT Delaware. Schall reasoned that because under G.L.c. 156C, §60 a merger can be approved by members owning more than 50% of the unreturned capital contributions of a limited liability company, Eriksson could cause the merger to occur without Allison’s involvement and this merger would therefore not constitute a breach of Eriksson’s fiduciaiy duties to Allison, regardless of the terms of new operating agreement.
On May 6, 2012, Eriksson offered to purchase Alison’s and the Alison Trust’s points in ATT for $53,775, i.e., 22.5% of the $239,000 valuation. The offer also required Alison to release his claims for deferred compensation. On May 8, 2016, Alison rejected the offer.
From May 5 to 21, 2012, Proppe was in Norway. Upon his return, Eriksson explained Schall’s merger plan to him and recommended it. Ater several phone calls, Proppe agreed to help implement it. ATT Delaware was formed on May 25,2012, when its Certificate of Formation was filed in the Office of the Secretary of State of Delaware. The Agreement and Plan of Merger was executed by Proppe as “Manager and Chief Executive Officer” of each of ATT and ATT Delaware on May 29, 2012. That evening Eriksson and Proppe met with Alison and informed him of the transaction. He had no prior notice of it, or Schall’s representation of ATT. The Agreement of Merger was filed in the Massachusetts Secretaiy of State’s office on June 1, 2012.
*651 There are significant differences between the rights of members under the ATT Operating Agreement and the ATT Delaware Amended and Restated Limited Liability Operating Agreement (the ATT Delaware Agreement). The ATT Delaware Agreement creates a new class of preferred shares, with a liquidation preference over the common shares. The power to manage ATT Delaware is expressly given to its Board, the members have no rights other than selecting directors. The Board is elected by the written consent of the holders of a majority of the shares of the company. The members have no fiduciary duty to the company or to each other, but rather only the duties specifically expressed in the ATT Delaware Agreement, all other duties or restrictions on self-interested actions are waived to the extent permitted by Delaware law. For example, the directors and members may compete with ATT Delaware by, among other things, owning or working for a business engaged in the same or similar activities or lines of business as ATT Delaware. Further, no member of ATT Delaware has any right of access to the books or records or to receive any information about the business or affairs of ATTDelaware, unless the Board decides to grant such access. The Board may also pick and choose which members may receive information and what information to disclose to them. There appears to be no restrictions on the Board’s right to withhold information, except as it may be necessary to the preparation of a member’s tax return. Also, no membership interest may be transferred without the approval of the Board, even to family members.
On June 17, 2012, Allison wrote to Eriksson and Proppe challenging the propriety of these transactions. On June 18, 2012, Eriksson signed subscription agreements pursuant to which he purchased $250,000 of preferred shares in ATT Delaware. Allison was given the opportunity to purchase sufficient preferred shares to maintain his percentage ownership interest in ATT Delaware, but declined. In or about July, Allison was denied further access to ATT’s offices, which by then had become the offices of ATT Delaware. Allison pointed out that, the subscription agreements required a purchaser to attest that he is an “ ‘accredited investor’ as defined in Rule 501 (a) of the Securities Act,” and he doubted that he could meet the financial requirements for that standard; although, the court finds that he would not have invested even if he could meet the accredited investor test.
Over the next 18 months, Eriksson purchased additional preferred shares such that his aggregate purchases (including the initial $250,000 investment) as of January 14, 2014 was $923,536. Although, Allison was given the opportunity to purchase preferred shares on each occasion that Eriksson did, he purchased none. In consequence, by that date, Allison’s and the Allison Trust’s ownership interest in ATT had been reduced to 3.32%. In the event of liquidation, his interests were subordinated to the preferred shareholders.
In August 2012, Allison, Eriksson, Proppe, and Schall met in an attempt to resolve Allison’s claim that Eriksson had breached his fiduciary duty to him by authorizing the merger and his subsequent purchase of preferred shares. The meeting was very contentious with accusations of bad behavior being cast at one another by Allison and Eriksson.[4] At one point Schall asked Allison if he would rather have a small percentage of an ongoing business or 22.5% of a defunct one, and Allison responded a larger percentage of the failed business.
Thereafter, Allison met with Proppe and Schall (but not with Eriksson as Allison and Eriksson could not engage in useful conversation) two or three more times in September and October 2012 in an attempt to reach a settlement. There appears to have been a willingness on the part of Eriksson to amend some of the provisions in the ATT Delaware Agreement to provide Allison with access to information and the opportunity to consult with Eriksson and Proppe on decisions affecting ATT Delaware, as well as a right of first refusal on additional investments or sale of shares. However, there was no willingness to reclassify Eriksson’s investments as debt and restore Allison’s percentage ownership in the company. Allison, made no offer in compromise that did not involve the return of his equity without risk of dilution except on the investment of a third-party. This action was, however, not filed until May 2013.
In July 2012, Michael Broomhead, Emma Eriksson Broomhead’s husband, began helping out at ATT on a part-time basis. He became CEO/CFO in November 2012. By that time, Weber had been terminated. Since then he has been the only full-time employee of ATT Delaware. Broomhead has an undergraduate degree in accounting and an MBA. He held management positions at other companies before joining ATT Delaware.
In 2013, the company generated $18,800 in revenue. In 2014, it generated $823,000 of revenue, most of this was from the sale of the Xpansion kits and an exclusive license to market them in the Western Hemisphere to a large medical equipment company. The company still operated at a loss during that year, as the cost of those goods included the payment to Wright medical as well as the costs of repackaging the product. Broomhead has unsuccessfully been trying to find a distributor for the kits in the Eastern Hemisphere. In 2015, ATT generated $461,033, almost all of that was from grants. Broomhead believes that the company will have an operating loss of $150,000 in 2016, which Eriksson has agreed to fund.
Much of the company’s expenses are associated with work on new intellectual property and the legal fees associated with patent applications. Since 2012, it has filed 21 patent applications; 11 patents have been granted, 9 of those based on applications filed after 2012.
Broomhead has been actively looking for investors or partners for ATT. He believes that he has contacted 78 firms who were either potential investors or larger *652 health care companies that might have an interest in ATT Delaware’s products, without success. At present, he is unaware of any potential investor or partner for ATT. Broomhead has invested $10,000 in ATT Delaware and Proppe $30,000.
RULINGS OF LAW Breach of Fiduciary Duty
In its Memorandum of Decision and Order on the Parties’ Cross-Motions for Summary Judgment (the Decision), the court explained its ruling that the fact that (i) Eriksson controlled sufficient ownership interest in ATT to approve the merger without Allison’s participation, and (ii) the Operating Agreement was silent on the topic of mergers, did not mean that Eriksson was insulated from claims that the clandestine merger of ATT into a Delaware entity that had an operating agreement that eliminated all protection for minority owners breached his fiduciary duty to Allison.[5] In the Decision, the court also explained that in Massachusetts minority shareholders also owe fiduciary duties to the other owners of a closely held business; and majority shareholders “have certain rights to what has been termed ‘selfish ownership’ in the corporation which should be balanced against the concept of fiduciary obligation to the minority permitting them room to maneuver and a large measure of discretion . . . [T]he court must allow the controlling group to demonstrate a legitimate business purpose for its action.” Pointer v. CasteUani, 455 Mass. 537, 549-50 (2009).
In this case, Eriksson certainly did not act with utmost good faith toward Allison when he surreptitiously retained Schall to represent ATT and then adopted Schall’s advice to merge ATT into ATT Delaware, thereby effectively unilaterally amending the operating agreement in a manner that not only permitted him to invest equity in ATT without Allison’s consent, thereby diluting Allison’s interests, but also deprived Allison of all minority rights that Delaware law permitted the parties to an operating agreement to eliminate by contract.[6] On the other hand, Allison’s position that he would not invest anything more in ATT or secure its debt with personal assets, while simultaneously asserting his right against diluting his interest, does not appear consistent with his own fiduciary responsibilities to Eriksson. Allison paid lip service to the notion that he would agree to dilution if an outside investor could be found, but it was evident that no such third-party investor was going to appear in time to save ATT. According to Orchard Partners, if someone were to provide $620,000 of financing to ATT, it would then be worth $239,000. Certainly, Eriksson was not acting unscrupulously when he explained that he was not going to finance the company with debt for a period of years, while Allison retained 22.5% of the equity in the company and was unwilling to work for it any longer. Clearly, it was not inappropriate for someone in Eriksson’s position to insist on an equity holder’s return on investment, if this very risky enterprise proved ultimately successful.[7]
In May 2012, ATT was out of money. Eriksson loaned it $26,000 to meet expenses including payroll. Clearly, Eriksson could have allowed ATT to liquidate and bid on its only asset in a liquidation auction its intellectual properly. In that event, it is not clear that anyone other than Eriksson would have been a bidder. But, of course, that is not what happened. Rather, Eriksson followed Schall’s advice and proceeded with the clandestine merger transaction.
The court finds that even though the approach that he took to solving his predicament was on the advice of his attorney, it nonetheless constituted a breach of fiduciary duty. The court, however, rejects Allison’s contention that the appropriate relief is to simply undue the merger and presumably convert Eriksson’s $1 million of equity investment into debt. First, Allison was a sophisticated corporate lawyer. He knew full well how to file a claim for preliminary injunctive relief, setting aside the merger before Eriksson invested significant cash in ATT in return for equity. Instead, he did not file this action until Eriksson had invested an additional $600,000 in the enterprise. While this case awaited trial for nearly three years, Eriksson invested another $400,000, without which ATT could not have continued in business. It is no longer possible to rescind the merger and return the parties to where they were in June 2012.
Further, Allison apparently was prepared to allow ATT to default on its obligations and presumably liquidate or dissolve before he agreed to relent on his right to prohibit Eriksson from acquiring additional equity in ATT. On May 14,2012, Allison sent an email to Eriksson advising him that the payroll administrator would attempt to charge ATTs bank account for Webber’s wages the following day, and there would be insufficient funds in the account, so the charge would be rejected. Allison then asks Eriksson if he is going to fund the payment. He makes no offer to contribute anything himself.
Under these circumstances, the court finds that it would be inequitable to enter an order invalidating the merger and converting Eriksson’s equity to some form of debt. Allison has offered no suggestions to the court for any alternative relief. Moreover, he offered no evidence from which the court could try to calculate some amount of monetary relief that might approximate Allison’s alleged loss. This is not a case in which Allison has alleged, let alone offered evidence to prove, that the amount of equity in ATT Delaware that Eriksson received in return for his purchases of preferred shares was unfair. Indeed, the only evidence on that point offered at trial was the Orchard Partner’s appraisal in which it concluded that if someone invested $620,000 in ATT, the enterprise would be worth $239,000, an immediate and substantial negative return on capital. Clearly, only someone like Eriksson who was committed to ATT’s intellectual property because he invented it (or for some other reason had an idiosyncratic commitment to ATTs success) would make such an investment. Compare Lynch v. Vickers Energy Corp., 429 A.2d. 497, *653 501-03 pel. 1981) (monetary damages ordered where rescission is not feasible because of the passage of time and subsequent corporate events transpired, but evidence of the fair value of the stock acquired for an unfair price could be calculated).
The court finds no precedent to assist it in fashioning appropriate equitable relief. Nonetheless, it will try.
First, the court sees no reason why the rights that minority members of a Delaware limited liability company enjoy absent contractual agreement to do away with them ought not be restored. Allison and Eriksson had agreed to a form of those rights when they signed the ATT operating agreement. The court orders that Eriksson and the Eriksson Trust cause an amended and restated operating agreement for ATT Delaware to be prepared and made effective that rescinds and/or amends the existing operating agreement in the following manner: section 6.01 is rescinded and the members shall have such voting rights as are provided under Delaware law; section 6.04(a) shall be rescinded to the extent that it eliminates fiduciaiy obligations of members to one another and directors and officers to the company and its shareholders, rather, the members shall have those obligations provided by Delaware law; and section 7.01, first two sentences, shall be rescinded, and members shall have access to the books and records of the company as provided by Delaware law. Additionally, the amended and restated operating agreement shall include a provision requiring the Board of ATT Delaware, on reasonable notice, not more than three times annually, to report to Allison either orally or in writing on the business and affairs of the company. Allison shall also be timely advised of any anticipated extraordinary business events such as the sale of substantially all of the assets of ATT Delaware or an investment either in the form of debt or equity by an outside investor or other significant financial transaction. If ATT Delaware prepares annual financial statements, a copy shall be provided to Allison.
Further, Allison’s (and/or the Allison Trust at Allison’s discretion) percentage interest in the equity of the company shall be grossed up to 5% and shall not be subject to dilution, unless there is an investment by a bona fide outside investor and then such dilution shall be only on the same terms as the other holders of common or preferred shares in the company. Stated differently, no further investment in ATT Delaware by any common or preferred shareholder existing at the time this judgment enters may reduce Allison’s interest below 5%. Further, if ATT Delaware liquidates before any outside investor invests in ATT Delaware, Allison’s 5% interest shall be treated pari passus with the preferred shareholders.
Allison still has claims against Karl Proppe and Gudrun Eriksson, as Trustees of the Eriksson Trust, for breach of fiduciaiy duly. While the Trust, as an equiiy holder in ATT, owed a fiduciaiy duly to Allison, it was only a minority owner. As noted above, Eriksson owned 55.5% of the ATT points in his own name and he did not require the Trust’s participation to effect the merger; nor could the Trust stop the transaction. Its acquiescence in Eriksson’s action did not constitute a breach of fiduciaiy duty and did not cause injuiy to Allison. Judgment shall enter dismissing the claims against the Trust asserted in Count I.
Breach of Contract
A breach of contract claim remains against Eriksson for breach of that provision of the Operating Agreement that states that the members are “under a duty to conduct the affairs of the Company in good faith.” Section 5.03.C.[8] The court finds that this contractual obligation was breached by Eriksson when he caused ATT to retain Schall and engage him to merge ATT into ATT Delaware without any prior notice to Allison. However, there was no evidence that Allison suffered a loss as a result of that breach of contract. As noted above, there is no evidence that Eriksson did not pay fair value for the additional equity in ATT Delaware that he purchased. Further, there is convincing evidence that if Eriksson had not provided additional financing, ATT would have been unable to pay its current debts. There is no evidence of ATT’s liquidation value, i.e., no evidence that a fire sale of its assets would have resulted in a distribution to Allison. Judgment shall therefore enter for Eriksson on the breach of contract claim.
Civil Conspiracy
A civil conspiracy claim against Eriksson and Pro-ppe also remains in this case. See Count IV. Here the claim is based on that theory of conspiracy in which “a person may be liable in tort if he knows that the conduct of another person constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.” Kurker v. Hill, 44 Mass.App.Ct. 184, 189 (1998) (internal quotations and citations omitted). “Key to this cause of action is a defendant’s substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan. In the tort field, the doctrine appears to be reserved for application for facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.” Id. Here, the tortious act is that of Eriksson, i.e., his breach of fiduciaiy duty to Allison. Conspiracy is not a second claim to be asserted against the primaiy actor, but derivative of the primaiy actor’s tortious act in order to hold another person liable for it. Therefore, judgment must enter for Eriksson on Count IV.
With respect to Proppe, he never met with Schall prior to August 2012, although he may have spoken with him once on the telephone. There is, however, no evidence concerning what was said in that call. The decision to merge ATT into ATT Delaware was reached by Eriksson and Schall, while Proppe was in Norway. After he returned, he had telephone conversations in which Eriksson convinced him that this was the best approach to *654 save ATT, which was in need of an immediate cash infusion that only Eriksson was prepared to make, and he would only make it in return for additional equity in the company. Proppe did sign the documents necessary to cany out the transaction in his capacity as Manager of ATT and the Manager of ATT Delaware. Clearly, that was substantial assistance; however, the court credits Proppe’s testimony that he thought this was in the best interest of ATT and fair to Allison. He certainly was aware that this transaction would enable Eriksson to make an equity investment, but it is not clear that he was aware of all of the other changes in the Operating Agreement. Additionally, because Eriksson owned in his own name more that 50% of the points in ATT, he had the ability to effect the transaction without Proppe, by executing a written consent to appoint a new manager. In any event, as Manager of ATT his primary responsibility would be to insure that ATT could pay its debts. The court finds that Proppe did not engage in a civil conspiracy to cause a breach of Eriksson’s fiduciaiy duly to Allison by signing the documents that permitted Schall to consummate the merger. Further, there is no relief that the court could enter against Proppe other than assisting in the amending the ATT Delaware agreement. It cannot order Proppe to give equity in ATT Delaware to Allison and there exists no basis for an award of monetary damages.
Judgment shall enter dismissing Count IV.
ORDER
For the foregoing reasons, Final Judgment shall enter as follows.
A. Under Count I, the court declares that Eriksson has breached his fiduciaiy duty to Allison and orders that, as the majority shareholder in Applied Tissue Technologies, LLC, he cause that company to amend its operating agreement to achieve the following:
section 6.01 of the ATT Delaware Agreement to be rescinded and the members shall have such voting rights as are provided under Delaware law; section 6.04(a) shall be rescinded to the extent that it eliminates fiduciaiy obligations of members to one another and directors and officers to the company and its shareholders, rather, the members shall have those obligations provided by Delaware law; and section 7.01, first two sentences, shall be rescinded, and members shall have access to the books and records of the company as provided by Delaware law. Additionally, the amended and restated operating agreement shall include a provision requiring the Board of ATT Delaware, on reasonable notice, not more than three times annually, to report to Allison either orally or in writing on the business and affairs of the company. Allison shall also be timely advised of any anticipated extraordinary business events such as the sale of substantially all of the assets of ATT Delaware or an investment either in the form of debt or equity by an outside investor or other significant financial transaction. If ATT Delaware prepares annual financial statements, a copy shall be provided to Allison.
Further, Allison’s (and/or the Allison Trust at Allison’s discretion) percentage interest in the equity of the company shall be grossed up to 5% and shall not be subject to dilution, unless there is an investment by a bona fide outside investor and then such dilution shall be only on the same terms as the other holders of common or preferred shares in the company. Stated differently, no further investment in ATT Delaware by any common or preferred shareholder existing at the time this judgment enters may reduce Allison’s interest below 5%. Further, if ATT Delaware liquidates before any outside investor invests in ATT Delaware, Allison’s 500 interest shall be treated pari passus with the preferred shareholders.
B. Judgment for the defendants dismissing all other counts and claims asserted in the complaint not previously dismissed pursuant to the order on the defendants’ motion for summaiy judgment.

 At some point, the parties agreed to reduce their salaries to $100,000 and $60,000 a year, respectively. The date these salaries were reduced is not clear.

 Between 2000 and 2005, Allison received $1,068,427 in distributions and salary from ATT. Allison testified that some of this was deferred compensation for a period before ATT had cash to pay him, but there were no documents reflecting a distinction between distributions and payment of deferred salary, such as a W-2, introduced in evidence, and the court doubts that the parties paid close attention to this issue.

 In April 2012, Schall moved his practice to WilmerHale, LLP. A new engagement letter was signed and Schall continued to represent ATT/Eriksson as he had while at Gunderson.

 In particular, Eriksson believed that Allison had used his superior knowledge of the law to include in the operating agreement provisions that were unfair to him.

 “Judicial inquiry into a freeze-out merger in technical compliance with the statute may be appropriate, and the dissenting stockholders are not limited to the statutory remedy of judicial appraisal where violations of fiduciaiy duties are found.” Coggins v. New England Patriots Football Club, 397 Mass. 525, 533 (1986). The rule is the same in Delaware: ‘The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved . . . Under such circumstances, the Chancellor’s powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . .” Weinberger v. UOP, Inc., 457 A.2d 701 (Del.S.Ct. 1983). There is nothing in the Limited Liability Company Act that would make this well-established tenet of business enterprise law inapplicable to limited liability companies.

 It may be noted that Allison never signed the ATT Delaware Agreement. In consequence, while Eriksson treated him as a member of ATT Delaware, he never actually became one.

 In its appraisal, Orchard Partners applied a 45% discount rate to future cash flow to calculate present value.

 In the Decision, the court found that causing ATT to merge into ATT Delaware was not in itself a breach of the Operating Agreement, because the Operating Agreement was silent on the subject of mergers.